Wanda R. WILLIAMS, Appellant,

v.

Charles MEREDITH, M. D., and Marshall Ruffin, M. D., Appellees.

Robert A. BEASLEY, Jr., Appellant,

v.

Charles MEREDITH, M. D., and Thomas W. Murphy, M. D., Appellees.

Andrew D. McGAUGHEY, Appellant,

v.

Charles MEREDITH, M. D., and Archangel D'Amore, M. D., Appellees.

Nos. 79–301, 79–302 and 79–340.

District of Columbia Court of Appeals.

Argued July 25, 1979.

Decided Oct. 2, 1979.

William J. Mertens, Public Defender Service, Washington, D. C., for appellants.

Mark J. Biros, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry, Paul L. Knight (in No. 79–302), and John Brooks Harrington (in No. 79–301), Asst. U. S. Attys., Washington, D.C., were on the brief, for appellees.

Before NEWMAN, Chief Judge, and KERN and FERREN, Associate Judges.

NEWMAN, Chief Judge:

Appellants, who have been deemed to be mentally ill and a danger to themselves and to others, were hospitalized involuntarily under an emergency commitment procedure and are currently in confinement at Saint Elizabeths Hospital. Appellee Meredith is the Superintendent of Saint Elizabeths Hospital. Appellees Ruffin, Murphy, and

D'Amore are the physician-members of the Commission on Mental Health who made the application for emergency hospitalization in each case.[1] Appellants urge that their confinement is illegal and that the trial court should have issued their requested writs of habeas corpus because the applications leading to their emergency commitments were signed by physicians not empowered by the District of Columbia Hospitalization of the Mentally Ill Act, D.C.Code 1973, §§ 21–501 to –592, to initiate the emergency commitment procedure. Although we agree with appellants that these physicians were not authorized by the statute to initiate emergency commitments, we affirm the trial court's refusal to issue the writs because the detentions have been approved after the subsequent judicial review required by the statute.

Proceedings for the court-ordered hospitalization of a person believed to be mentally ill normally begin when an appropriate petition is filed with the Commission on Mental Health by that person's "spouse, parent, or legal guardian, by a physician, by a duly accredited officer or agent of the Department of Public Health, or by an officer authorized to make arrests in the District of Columbia." D.C.Code 1973, § 21–541(a). After appropriate notice has been given, D.C.Code 1973, § 21–541(b), the Commission conducts a hearing, D.C.Code 1973, § 21–542, to determine whether the person is "mentally ill, and because of the illness is likely to injure himself or other persons if allowed to remain at liberty." D.C.Code 1973, § 21–544. The Commission is composed of nine members: one lawyer-member who acts as permanent chairman, and eight physician-members who serve part-time. D.C.Code 1973, § 21–502(a). The Commission hears cases in panels of three members consisting of the chairman and two physician-members. D.C.Code 1973, § 21–502(c). If, after the hearing, the Commission determines that the person should be hospitalized, it makes findings to that effect, serves notice of its decision, and sends its report to the Superior Court. D.C.

Code 1973, § 21–544. Upon receipt of the Commission's report recommending hospitalization, the trial court begins a civil commitment procedure. D.C.Code 1973, § 21–545. Although the statute provides that the Commission shall order the release of a person if it finds that he is not mentally ill or if it finds that, while mentally ill, the person does not constitute a danger to himself or to others, D.C.Code 1973, § 21–544, the Commission does not have the power under the statute to order a person to be hospitalized, nor does the statute provide for involuntary hospitalization within this regular commitment procedure prior to judicial action.

The statute also contains provisions under which emergency hospitalization of certain mentally ill persons can be accomplished. The procedures for such emergency hospitalization—that is, for involuntary commitment prior to judicial action—are set forth in §§ 21–521 to –528. Application for emergency hospitalization may be made to a public or private hospital by "[a]n accredited officer or agent of the Department of Public Health of the District of Columbia, or an officer authorized to make arrests in the District of Columbia, or a physician of the person in question." D.C.Code 1973, § 21–521. Within 24 hours of a person's admission to a hospital on this application, the hospital administrator must serve notice of the admission to the person's spouse, parent, or legal guardian, and to the Commission. D.C.Code 1973, § 21–522. A person hospitalized in this manner may not be detained for more than 48 hours unless, within that period, the administrator petitions the trial court for an order authorizing emergency hospitalization for observation and diagnosis for a period of not more than seven days from the time of the order. D.C.Code 1973, § 21–523. Other provisions of the statute deal with the court's order, D.C.Code 1973, § 21–524, the requirement of a contested judicial hearing, D.C.Code 1973, § 21–525, the scheduling of events required by the statute, D.C.Code 1973,

---

1. Judge Mencher made the determination of probable cause in each of these cases. Judge Taylor considered the applications for writs of habeas corpus.

§ 21–526, and the examination and release of a person detained under these emergency procedures, D.C.Code 1973, § 21–527. Section 21–528 provides:

> Notwithstanding any other provision of this subchapter [dealing with emergency hospitalization procedures], the administrator of a hospital in which a person is hospitalized under this subchapter may, if judicial proceedings for his hospitalization have been commenced under subchapter IV [dealing with court-ordered hospitalization, discussed above] of this chapter, detain the person in the hospital during the course of the judicial proceedings.

The petition for appellant Beasley's court-ordered hospitalization was filed by his father.[2] The supporting affidavit stated that Beasley had a history of psychiatric treatment at area hospitals and that, *inter alia*, he assaulted his relatives and neighbors, stayed up all night smoking and drinking, slept all day, and broke up ashtrays and tables. The Commission held its hearing on February 13, 1979. At the conclusion of the hearing, the chairman announced that the Commission would recommend court-ordered hospitalization. The chairman then told appellant, "Dr. Murphy is going to make application for your admission to the hospital here today." Dr. Murphy was a member of the Commission panel that had just decided the case. The chairman then directed the Deputy United States Marshal to take appellant downstairs to the Saint Elizabeths admission office. Dr. Murphy thereupon filed an application for emergency hospitalization pursuant to § 21–521. On the same day the hospital approved the application and detained appellant pursuant to § 21–522. On February 15, 1979, after that hearing, Judge Mencher, acting in an *ex parte* proceeding as provided by statute, §§ 21–523 & –524, approved the hospital's request for a 7-day extension of the initial detention. Appellant requested a hearing under § 21–525, and, on February 23, 1979, Judge Mencher adhered to his previous finding that there was probable cause to believe that appellant was mentally ill and dangerous. On February 22, 1979, the hospital filed a second petition for court-ordered hospitalization through the regular procedures, pursuant to § 21–541. On the strength of this petition and § 21–528, Judge Mencher ordered the emergency hospitalization to continue beyond the 7-day limit and until the trial on the petition for court-ordered hospitalization.

On February 28, 1979, appellant challenged his confinement by petitioning the Superior Court for issuance of a writ of habeas corpus. He asserted that Dr. Murphy was not a person authorized by the statute to make application for his emergency hospitalization and that his continued confinement, flowing from this improper initial step, was illegal. On March 1, 1979, Judge Taylor denied the petition. This appeal followed.

---

**2.** The factual patterns of the three cases before us on this appeal are virtually identical, and the cases differ only as to the identity of the principal actors and the dates upon which the various events occurred. Consequently, only the facts of the Beasley case will be recounted in full.

> The petition for appellant Williams' court-ordered hospitalization was filed by her mother. The supporting affidavit averred that appellant refused to eat ("She waits for the Lord to tell her to eat"), burned food that she had forgotten on the stove, and generally was unable to care for herself ("She says she is a child of God and that they do not have to work as the Lord will take care of her"). Appellant had received psychiatric treatment but stopped taking the medicine prescribed for her.

> The petition for appellant McGaughey's court-ordered hospitalization was filed by his father. The supporting affidavit stated that appellant had undergone psychiatric treatment in area hospitals but had stopped taking his medicine. When at the Washington Hospital Center, appellant had barred the door to the office of his treating physicians and had behaved in a threatening manner. He had attacked his parents, harassed them for money, threatened to get his father fired from his job, and was loud and profane "when crossed." A subsequent letter stated that the police had apprehended appellant after he had gained illegal entry to the roof of a southwest apartment complex where he was sunbathing in the nude. At the time, the letter stated, appellant threatened to gouge his father's eyes out and to push him over the terrace roof.

■ The principal question posed by this case is whether a physician-member of the Commission on Mental Health, who participated in recommending that an individual should be hospitalized under the "emergency" provisions of the statute is a "physician of the person in question" who may file an application for emergency hospitalization under § 21–521. This is a question of first impression, and we seek guidance from the enacted text of the statute and from the legislative history.[3]

As originally enacted, the predecessor of the current § 21–521 permitted public health officers, police officers, and the "family physician of the person in question" to make application for that person's emergency hospitalization. Act of Sept. 15, 1964, Pub.L. 88–597, § 6(a), 78 Stat. 944. The drafters of the bill included family physicians as persons empowered to make this application after one of the witnesses at hearings on the matter stated in his testimony that people are more likely to turn to their family doctors for help in this sort of situation than they are to seek assistance from the police and other authorities. Senate Comm. on the Judiciary, Protecting the Constitutional Rights of the Mentally Ill, S.Rep., No. 925, 88th Cong., 2d Sess. 15 (1964). That same witness, testifying about five years later at hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, expressed the view that the term "family physician," as it appeared in the statute and as it had been interpreted, was too narrow in scope because "many patients today do not have a family physician who is readily available, particularly in an emergency situation where we often must deal with transients." *Constitutional Rights of the Mentally Ill: Hearings before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 91st Cong., 1st & 2d Sess. 19–20 (Statement of Zigmond M. Lebensohn, M.D.) [hereafter *Senate Hearings*]. Other witnesses also were of the view that the "family physician" language

in the original statute was too narrow. *Id.* at 123–24 (Statement of Dr. John D. Schultz), 322–23 (Statement of Dr. Sherman Kieffer). *See Court Reorganization, Criminal Law Procedures, Bail, and Public Defender Service: Hearings before Subcomms. No. 1 of the House Comm. on the District of Columbia*, 91st Cong., 1st Sess. at 107 (Statement of Associate Deputy Attorney General Donald E. Santarelli). Amendments suggested by various witnesses would have authorized the filing of applications for emergency hospitalization by any physician or by any physician who had examined the individual within 72 hours. *See id.* at 107 (Statement of Donald E. Santarelli); *id.* at 252 (Statement of Mrs. Lloyd Symington). *See also Senate Hearings* at 322–23 (Statement of Dr. Sherman Kieffer). Dr. John D. Schultz, another witness at the hearing, spoke in favor of amending the statute by omitting the word "family" from the provision. Although Dr. Schultz preferred the term "family physician" as descriptive of a particular doctor-patient relationship, he felt that the term in the original statute had been interpreted literally and therefore too narrowly. Thus he favored amending the statute so that a broad interpretation of the family physician concept could be read back into it. He described his interpretation of the term as follows:

> [W]e refer to the physician of the patient as the doctor the patient or the family has selected or went to for help, whether in a private practice, in a clinic or at a hospital. Today the doctor selected by the patient for the treatment of any illness presented to him for care is the family physician in the sense that the doctor has accepted the medical responsibility for the patient. By medical ethics, he cannot discharge the patient until he has effectively arranged a transfer of responsibility or other suitable mechanism for care. We believe the phrase "family physician" does not mean, for

---

**3.** Because of the decision we reach, we need not, and thus do not, address appellants' collateral contention that the act of making the application under § 21–521 was performed by or at the direction of the Commission.

example, a company or agency personnel health office whom a supervisor of an employee might call in to deal with a troublesome employee. [*Id.* at 123.]

These references from the legislative history, coupled with the fact that the Congress employed the statutory formulation "physician of the person in question" instead of one of the more inclusive alternatives suggested, indicate that the Congress was concerned with the role to be played by physicians empowered under the statute to initiate the emergency commitment procedure. Congress apparently sought to insure that the physicians who would be permitted to act in a quasi-official capacity in this emergency procedure would possess a patient-oriented role identification. Whereas public health officers and police officers are guided by their duty to protect the public, physicians acting in this emergency capacity, as envisioned in the original "family physician" formulation in any event, were to be guided in acting for the individual's best interest by their role as the voluntarily selected professional who owes professional responsibility and a professional's loyalty to the individual.

By amending the "family physician" language Congress apparently was persuaded to expand the scope of the phrase which had been interpreted in a narrow manner that has become nearly archaic in contemporary society. But, by the same token, Congress chose not to abandon entirely the elements of role guidance inherent in the "family physician" formulation and declined to authorize any physician or physician who had examined the individual within 72 hours to act. By choosing language midway between these two extremes, Congress has placed continuing importance upon the guidance of a protective role identification and upon the criteria of voluntariness and loyalty.

We have a further indication that Congress was concerned with the roles played by participants in the involuntary hospitalization procedures. Section 21–502(c) states that "[p]hysician-members of the Commission may practice their profession during their tenure of office, but may not participate in the disposition of the case of a person in which they have rendered professional service or advice." This indicates that Congress sought to insulate the physician-member's public official role from any conflicts arising out of his role in the voluntary physician-patient relationship—conflicts that might jeopardize the physician-member's impartiality.

By retaining the definitional language "physician of the person in question" in the face of suggestions that less restrictive language be substituted, Congress appears to have intended to identify a physician who would be empowered to initiate the emergency hospitalization procedure by his relationship with the person in question and not merely by his identification as a member of the profession. The exact dimensions of this relationship—implicit in the "family physician" formulation but moderated in the current wording of the statute—is not of immediate concern in the case before us. The statutory language read in the light of the legislative history, discussed above gives a general suggestion of what this relationship encompasses, and we conclude that the role performed by a physician-member of the Commission—the role of a government official taking part in a government decision that will contribute to a person's involuntary detention—is at odds with the relationship suggested by the statute. The statute permits certain specified government officials to act in this capacity, but it does not include Commission members. It does include physicians without regard to whether they are publicly or privately employed, but it requires of them a particular relationship with the individual as a precondition to acting. We hold, therefore, that the statutory phrase "physician of the person in question" does not include physician-members of the Commission who participated in recommending that the person in question be hospitalized. The initial application for emergency hospitalization signed

by the physician-member of the Commission in each of these three cases was improper.[4]

Our conclusion that the initiating acts were improper, however, does not lead inexorably to the conclusion that the trial court should have issued the writs of habeas corpus requested by appellants. Appellants contend that because the initial act causing their detention was illegal, their continuing detention is illegal. They urge that each step in the hospitalization process is jurisdictional as to the subsequent steps, that all steps already taken to initiate and maintain an individual's detention must be proper as a precondition to those other steps that will confirm and prolong the detention. Appellants argue, therefore, that the trial court, acting under § 21–523, could not extend their confinement because the original applications were improper.

 When an individual is detained on an emergency basis prior to a judicial determination of the need for his involuntary hospitalization, the government has the burden of showing probable cause to justify detaining him. *In re Barnard*, 147 U.S.App. D.C. 302, 305, 455 F.2d 1370, 1373 (1971). *Barnard* draws an analogy between the judicial determination of probable cause in criminal matters and the judicial determination to extend the involuntary hospitalization of an individual who is believed to be a danger to his own safety and to the safety of others. In either situation the power to detain an individual against his will for more than a relatively brief march of time resides with the courts rather than the executive branch of government or its surrogates. *See id.* at 305–08, 455 F.2d at 1373–76. This judicial determination that a detention is justified by demonstrable facts is an assurance that an individual will not be held without legally cognizable reasons for any extended period. In each of the cases before us the trial court reviewed the emergency hospitalization to determine, first upon an *ex parte* proceeding under

§§ 21–523 & –524 and then after a contested hearing under § 21–525, whether there was probable cause to justify the continued detention. The fact of an independent judicial determination of the need for further involuntary hospitalization thus remedied the legal imperfection of the original detention by the rulings that the facts warranted the extended detentions. Thus, the trial court did not err in refusing to issue the requested writs.

*Affirmed.*

---

4. Of course, where a physician who is a member of the Commission has the appropriate doctor-patient relationship contemplated by the statute, he may sign an emergency application as to such patient so long as he has not and does not participate in Commission proceeding as to such patient.