**In the Matter of Marisa ROSELL, Appellant.**

No. 86–464.

District of Columbia Court of Appeals.

Argued April 26, 1988.
Decided Sept. 2, 1988.

Laurie B. Davis, with whom James Klein, and David Reiser, Public Defender Service, Washington, D.C., were on the brief, for appellant.

Alan L. Cohen, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, Charles L. Reischel, and Ann O'Regan Keary, Deputy Corp. Counsel, were on the brief, for appellee. Joseph E. diGenova, U.S. Atty. at the time the brief was filed, Michael W. Farrell, and Jody Goodman, Asst. U.S. Attys., Washington, D.C., were also on the brief for appellee.

Before TERRY, ROGERS and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

■ After a near-fatal suicide attempt, appellant Rosell was taken by ambulance to the emergency room at George Washington University Hospital. At the hospital, a Dr. D.S. Galloway made application, pursuant to D.C.Code § 21–521 (1987 Supp.),[1] for her involuntary admission to St. Elizabeths Hospital for emergency psychiatric care. According to § 21–521, "a physician or qualified psychologist of the person in question, who has reason to believe that a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained" may make such application. After Rosell was so admitted, her continued detention for up to seven days was ordered by the court after both an *ex parte* consideration under D.C.Code §§ 21–523 & –524 (1981 & 1987 Supp.), and a hearing conducted upon Rosell's request under D.C.Code § 21–525 (1981). Before us, Rosell seeks reversal and remand with instructions to the court and St. Elizabeths to amend their records to indicate that the detention was unlawful and that she was not mentally ill under the Act.[2] She bases her appeal on two contentions: 1) that Dr. Galloway was not Rosell's physician and hence not qualified under the Act to apply for her involuntary emergency hospitalization, and 2) that the record does not support the determination of mental illness. We affirm.

## I

■ At the commencement of the § 21–525 hearing, Rosell moved to dismiss the involuntary hospitalization action against her on the grounds that the application for her emergency hospitalization was invalid, Dr. Galloway not having been "the physician of the person in question." A physician under § 21–521 is someone who is acting as more than a mere member of the medical profession; rather, the physician must possess a "patient-oriented role identification." *Williams v. Meredith*, 407 A.2d 569, 573 (D.C.1979). Dr. Galloway was a psychiatry resident at George Washington University Hospital who was called in when Rosell arrived there and conducted an hour-long consultation with her. Though Dr. Galloway did not testify at the hearing, a law clerk from the U.S. Attorney's Office testified that Dr. Galloway told her that it was "a fairly comprehensive interview." He indicated that appellant was initially resistant but described her "as becoming more comfortable and even volunteering information." According to the law clerk, Dr. Galloway said "he was acting primarily for [appellant's] benefit, with her best interest in mind." In contrast, Ms. Rosell testified that she did not want to talk to Dr. Galloway but "figured that [she] had to.... He didn't ask [her] if [she] wanted to." However, Dr. Galloway asked her if she wanted to talk to her own doctor, and she said no.

■ Though the trial court initially ruled that Dr. Galloway did qualify as Rosell's physician under the Act, it subsequently decided to reserve that decision until it had heard the complete hearing testimony regarding Rosell's contact with Dr. Galloway. At the close of the hearing, the court found the continued detention was justified because the government had met its burden of showing probable cause to believe that Rosell suffered from a mental illness within the meaning of the Act and as a result was likely to injure herself if not detained. *See In re Barnard*, 147 U.S.App.D.C. 302, 305–06 & 307 n. 12, 455 F.2d 1370, 1373–74 & 1375 n. 12 (1971).

The court then reversed its initial ruling regarding Dr. Galloway's status and held that the evidence was insufficient to show that Dr. Galloway was Rosell's physician. Nevertheless, the court denied appellant's

1. The provision is a part of the District of Columbia Hospitalization of the Mentally Ill Act ("the Act"), D.C.Code §§ 21–501 to –592 (1981 & 1987 Supp.), also popularly known as the "Ervin Act."

2. Rosell's discharge from the hospital several days after the hearing does not render this appeal moot. *In re Morris*, 482 A.2d 369, 371–72 (D.C.1984).

motion to dismiss and ordered the continued detention, citing *Williams, supra,* and *In re Morris,* 482 A.2d 369 (D.C.1984). In *Williams,* we held that the fact that the doctor who applied for emergency detention was not the "physician of the person" was "remedied" by the "independent judicial determination of the need for further involuntary hospitalization." *Id.,* 407 A.2d at 574. Before us, Rosell seeks to distinguish her case on the ground that in *Williams* the challenge to the application came after the probable cause hearing while in her case the challenge came at the start of the hearing. But we applied the *Williams* analysis in *Morris, supra,* where an application was challenged before a requested hearing took place. 482 A.2d at 370. The fact that the appellant then waived the hearing did not save him from the *Williams* result, as he had hoped it would; we still ruled that the court's *ex parte* determination of probable cause for further detention under D.C.Code § 21–523 & –524 remedied the imperfection of the initial application. 482 A.2d at 373.[3]

Nor are we persuaded by appellant's reliance on *In re Blair,* 510 A.2d 1048 (D.C. 1986). In that case, we held that a motion to dismiss at the probable cause hearing should have been granted because appellant sought voluntary admission and hence her involuntary hospitalization was never justified. In the case before us, by contrast, the imperfection of the initial application does not nullify the ultimate validity of the involuntary hospitalization. *See In re DeLoatch,* 532 A.2d 1343 (D.C.1987), wherein we declined to follow the *Williams* analysis when the trial court failed to conduct a hearing within 24 hours of appellant's request, as required by § 21–525. We distinguished *Williams* and *Morris* because those cases involved "minimal procedural deficiencies which did not significantly infringe upon the due process interests of the patients," and we particularly noted that in *Morris,* aside from the imperfection of the initial detention, the hospitalization did not extend beyond the Act's time limitations without receiving "independent judicial review." 532 A.2d at 1345.

Hence, even assuming the court was correct in its ultimate ruling that the evidence was insufficient to prove that Dr. Galloway met the definition of a "physician of the person,"[4] the continued detention was justified on the basis of *Williams* and *Morris,* by which we as a panel are bound.

## II.

Appellant also contends that her diagnosis of two "mental disorders"—an adjustment disorder with depressed mood and a borderline personality disorder[5]—does not qualify her as "mentally ill" for the purpose of involuntary hospitalization. Mental illness is defined in the Act as "a psychosis or other disease which substantially impairs the mental health of a person." § 21–501. Appellant contends that there is no indication that she was suffering either from a psychosis[6] or from any "disease." She asserts in her brief that "a disorder is commonly understood to be something distinct from a disease." In essence, appellant urges upon us a view that the Act envisions hospitalization only for non-psychotic people who suffer from some "disease"; that is, from some physiological or organic dysfunction which is accompanied by mental disorder.

■■■ However, as the government points out, this analysis ignores the plain

---

**3.** We note that the imperfection of the application in *Morris* was somewhat more substantial than that in the case before us. The date of the application had been altered and the physician had not examined the patient within 72 hours prior to submitting the application as required by D.C.Code § 21–582(b). 482 A.2d at 370–71.

**4.** We need not decide this question. We do not understand appellant to seek that the records be amended solely to show that the initial detention was invalid.

**5.** Dr. Rojcewicz, the supervising psychiatrist on Rosell's ward at St. Elizabeths, so testified at the probable cause hearing, based on his own examination of the patient, his discussion with other treating doctors, and his review of her record.

**6.** The government does not disagree with this contention that appellant was not suffering from a psychosis, and indeed the trial court specifically so found.

wording of the definition of mental illness in the Act. The phrase "psychosis or *other* disease" implies that the drafters considered a psychosis itself to be a "disease." But a psychosis is a mental disturbance, which may or may not have physiological roots. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (26th ed. 1981); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1966). As noted in *Millard v. Harris*, 132 U.S.App.D.C. 146, 150–51, 406 F.2d 964, 968–69 (1968), the Act's definition of mental illness reflects a "fuller, more contextual conception of mental disturbances" and is accorded "a liberal construction." The concurring opinion in *Millard* although addressing the point of criminal liability, lucidly makes the general point as follows:

> Perhaps at one time it would have been appropriate to hassle over whether a disorder is really an illness. I think we are now beyond that. The term disorder is used to encompass a broad variety of mental ills, ranging from psychoses to character defects. In any functional sense the term clearly refers to illness in the meaning appropriate here—an abnormal mental condition for which medical treatment is felt to be appropriate.

132 U.S.App.D.C. at 163 n. 10; 406 F.2d at 981 n. 10 (Wright, J., concurring). Here, Dr. Rojcewicz, *see* note 5 *supra*, not only testified as to the nature of appellant's mental disorders [7] but in addition expressed the view that her condition required psychotherapy and possible medication, *i.e.*, medical treatment.

Further, appellant's proposed analysis challenges common sense. With apparent incredulity, the trial court summarized appellant's argument as suggesting that Congress intended to exclude from the Act "those people with personality disorders, even though conceivably that personality disorder could result in them killing themselves ...". Bearing in mind the fact that the definition of mental illness applies throughout the Act, and thus to voluntary hospitalization under § 21–511 as well as to involuntary hospitalization, we agree with the trial court that Congress could not have intended the construction of "mental illness" to be as narrow as appellant urges.

At bottom, we deal here with a situation where a judicial determination has been made after a full evidentiary hearing that probable cause existed to believe that appellant was "mentally ill and, because of that illness ... likely to injure herself or others" unless immediately hospitalized for observation and diagnosis not to exceed the limited maximum period allowed by the Act. *See In re Barnard, supra*, 147 U.S. App.D.C. at 305–06 & n. 9, 455 F.2d at 1373–74 & n. 9. In such circumstances, with full recognition of the important liberty interests at stake, *see, e.g., In re James*, 507 A.2d 155 (D.C.1986), some caution would seem in order against an excessively stringent interpretation of the emergency hospitalization portion of the Act before us here.

AFFIRMED.

ROGERS, Associate Judge, concurring:

I join the majority opinion because this division is bound to follow *Williams v. Meredith*, 407 A.2d 569 (D.C.1979), and *In re Morris*, 482 A.2d 369 (D.C.1984). *M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971). I write separately because of my concern about what has happened to the statutory requirement that an application for involuntary hospitalization must be completed by "a physician or qualified psychologist of the person." D.C.Code § 21–521 (1987 Supp.). According to our decisions, this requirement need no longer concern us if the committing court finds that there is probable cause to confine the person for whom an application has been filed by a licensed physician who has had some form of personal contact with the patient. In view of the careful efforts in the District of Columbia Hospitalization of the Mentally Ill Act (Ervin Act) to protect a prospective

---

7. It is true, as appellant points out, that the psychiatrist in answer to a question refused to characterize her condition as a disease, noting that "the American Psychiatric Association has not made any definitions of disease." But this does not control the question of statutory construction before us.

patient's rights and the Act's preference for voluntary commitment over involuntary commitments, *see In re Lomax* 386 A.2d 1185, 1188 (D.C.1978) (en banc) (citing *Covington v. Harris*, 136 U.S.App.D.C. 35, 41, 419 F.2d 617, 623 (1969)), the former "being nontraumatic to the patient and avoid[ing] the stigma of enforced hospitalization [and] ... insur[ing] that patients may be treated at a time when prognosis for recovery is greatest—before they become seriously ill[,]" S.REP. No. 925, 88th Cong., 2d Sess. 11 (1964); *see also* H.R.REP. No. 1833, 88th Cong., 2d Sess. 5 (1964), our decision in the instant case fails to come to grips with the statutory limitation of a "physician of the person." *See Nova Univ. v. Educational Institution Licensure Comm'n*, 483 A.2d 1172, 1179–80 (D.C.1984) (court's interpretation of statute should not render any provision of statute meaningless), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985); *Office of People's Counsel v. Public Serv. Comm'n*, 477 A.2d 1079, 1084 (D.C.1984) (same); *cf.* W. DORLAND, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1016 (26th ed. 1981) (defining "family physician" as "a medical specialist who plans and provides the comprehensive primary health care of all members of a family ... on a continuing basis").

As originally enacted, the Ervin Act contained the language "family physician." *See* Act of Sept. 15, 1964, Pub.L. No. 88–597, § 6(a), 78 Stat. 944, 946. The use of this language appears to have derived from a Congressional preference for voluntary commitment over involuntary commitment, *see* H.R.REP. No. 1833, 88th Cong., 2d Sess. 5 (1964), and from a belief that in situations requiring emergency hospitalization, individuals were more likely to enlist the aid of their family physician rather than that of the police or other governmental authorities. *Id.* at 11. The text of the statute retained the "family physician" language until 1970, when the words "physician of

the person" were substituted for "family physician." District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, § 150(c)(2), 84 Stat. 473, 567.

In *Williams v. Meredith, supra,* the court referred to testimony given by witnesses while the Court Reform Act was being considered that the language "family physician" was too narrow because it was being interpreted literally and many patients no longer have a readily available family physician, particularly in the case of transients for whom emergency care is often required. 407 A.2d at 572–73 (quoting *Constitutional Rights of the Mentally Ill: Hearings Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary,* 91st Cong., 1st & 2d Sess. 19–20 (1970)). Although not referring to any statement reflecting Congressional intent, the court nonetheless concluded that Congress was concerned with the role played by physicians and "sought to ensure that the physicians who would be permitted to act in a quasi-official capacity in this emergency procedure would possess a patient-oriented role identification." *Id.* at 573. The court distinguished such physicians, who would offer "the guidance of a protective role identification and ... [would act] upon the criteria of voluntariness and loyalty[,]" from "public health officers and police officers [who] are guided by their duty to protect the public...." *Id.* The court also gleaned from the provisions of D.C.Code § 21–502(c) Congressional concern that there be no conflict of interests that might jeopardize the physician's impartiality. *Id.*

With this background it hardly can be suggested that the requirement that the application be filed by the "physician of the person" is no longer a significant part of the Ervin Act. To avoid unnecessary involuntary hospitalizations [1] a "physician of the person" should be a duly licensed physician

---

1. The legislative history of the Ervin Act states:
   The policy of [the legislation] to encourage voluntary admissions deterred the subcommittee from providing for detention of voluntary admittees when judicial proceedings for their hospitalization are initiated. It was thought that if individuals realize that there are absolutely no restraints on their release, they will be less hesitant to apply as voluntary patients.
   S.REP. No. 925, 88th Cong., 2d Sess. 15 (1964).

who has assumed, with the consent of the person to be treated, treatment responsibility at least for the time necessary to permit discussion with a person, and who, in the best interests of that person, has explored to the extent that the patient (and/or the patient's family or guardian) is mentally competent to do so, the alternative forms of available treatment. Thus, in *Williams v. Meredith* the court concluded that the statute required a doctor who "must be guided in acting for the individual's best interest by [his or her] role as the voluntarily selected professional who owes professional responsibility and a professional's loyalty to the individual." 407 A.2d at 573. Absent evidence that a physician has advised a person of treatment alternatives, the trial court is not in a position to be sure that an involuntary commitment is necessary. *See, e.g., In re Morris, supra,* 482 A.2d at 373–74 (patient's records to be amended to show voluntary commitment).

In the instant case, unlike the patient in *Williams v. Meredith,* Rosell attacked the failure to comply with § 21–521 before a probable cause determination had been made, and the trial court found that the emergency one-hour consultation did not meet the statutory requirement.[2] From this finding, it would seem to follow that no further proceeding could occur until a person is consulted by "a physician of the person" who thereafter concludes that involuntary commitment is required. Indeed, I fail to understand why the hospital did not view it to be in its own interest to permit Rosell an opportunity to consult with a physician whom she voluntarily selected before an application for an involuntary commitment was prepared. Neither the hospital nor the government can have a preference for involuntary over voluntary commitments in view of the statutory scheme. And, absent circumstances not present here, where, for example, an individual is incompetent and without family or any other caring person, or an emergency exists,[3] the delay attendant upon observance of the statutory requirement for preparation of an application by a "physician of the person," is, in my view, more consistent with Congressional intent, *see Lomax, supra,* 386 A.2d at 1188, than the after-the-fact procedure that this court has approved.

---

2. In *Morris,* the court was not presented with a challenge to the application for involuntary commitment on the ground that the signing physician was not a "physician of the person," but rather that such physician had not examined Morris within the statutory timeframe. 482 A.2d at 371. *See* D.C.Code § 21–582(b) (physician must examine patient within 72 hours of signing application for involuntary commitment).

3. H.R.REP. No. 1833, 88th Cong., 2d Sess. 1 (1964) (since emergency admission procedures lack some of the safeguards of judicial hospitalization, they should be used only in clear emergencies); S.REP. No. 925, 88th Cong., 2d Sess. 16 (1964) (same).