In re Ann HERMAN, Appellant.

No. 90–815.

District of Columbia Court of Appeals.

Argued April 17, 1991.
Decided July 10, 1991.

J. Patrick Anthony, for appellant.

Sheila Kaplan, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, Charles L. Reischel and Ann O'Regan Keary, Depu-

ty Corp. Counsel, were on the brief, for appellee.

Before ROGERS, Chief Judge, and STEADMAN and FARRELL, Associate Judges.

STEADMAN, Associate Judge:

Appellant was involuntarily admitted to St. Elizabeths Hospital for emergency observation and diagnosis under D.C.Code § 21–521 (1989). The application was signed by a physician who, appellant asserts, did not meet the prerequisites set forth in that section and § 582(b).[1]

At a hearing pursuant to § 525, the trial court found that probable cause had been established to believe that "respondent is mentally ill, and, because of that illness, is likely to injure herself unless immediately hospitalized." Accordingly, the court authorized continued emergency observation and diagnosis pursuant to § 524(a)(1), which cannot exceed seven days unless formal hospitalization proceedings are commenced. §§ 21–523, –528. The trial court rejected appellant's argument that the defects in the original application for hospitalization mandated her immediate release, holding that such defects, if any, had been "cured" pursuant to our holding in *In re Rosell*, 547 A.2d 180 (D.C.1988). We affirm the action of the trial court.

I

Appellant is a sixty-eight-year-old woman with a history of mental illness, including psychiatric hospitalizations over the past thirty years. In February 1990 she arrived in the District of Columbia where she took up residence in the shelter operated by the Community for Creative Nonviolence, located at 2nd and D Streets, N.W. As time went on, the shelter staff became increasingly concerned about appellant's behavior,

and invoked the aid of Priscilla Porter, a social worker assigned to work with female residents at the shelter who had become familiar with appellant during her stay at the shelter. Appellant refused to speak with Ms. Porter or any other clinician about her situation or to accept any medical help at the shelter. However, a crisis mental health team from the Emergency Psychiatric Response Division ("EPRD") did make an hour-long assessment of appellant on June 7, 1990, but did not refer her for emergency hospitalization at that time.

On June 8, 1990, Ms. Porter requested that Jannelle Goetcheus, M.D., the medical director of the Health Care for the Homeless clinic, examine appellant at the shelter. Apparently Ms. Porter suggested to Dr. Goetcheus that she remove her stethoscope and not identify herself as a doctor. According to Ms. Porter, who witnessed the interview, appellant did speak briefly with Dr. Goetcheus "for several minutes,[2] until she [appellant] realized, I think, that she [Dr. Goetcheus] was a doctor.... And then she [appellant] got up and walked away." Dr. Goetcheus then spoke with several staff members. She also discussed the situation with Dr. Keesling, the psychiatrist who is the head of the EPRD, and he advised her to make the necessary application for involuntary hospitalization.

Dr. Goetcheus thereupon filled out the application required by § 521. She erroneously checked the box identifying herself as a "physician employed by the United States or the District of Columbia." She also failed to check the box that related to compliance with the requirements of § 582.[3]

The form, signed by Dr. Goetcheus, did state, in its printed text, that the applicant has "reason to believe" that the person to be hospitalized "is mentally ill and, because

---

1. This and all future section references are to Title 21 of the D.C.Code.

2. Ms. Porter subsequently estimated the time as "three to five minutes," and characterized appellant as having "stormed out."

3. The unchecked box states: "that I am not related by blood or marriage to the alleged

mentally ill person; that I am not financially interested in the hospital to which said person is to be detained; and that the statements made hereinafter are based on my personal observations and examination of said person not more than 72 hours prior to the making of this application."

of such illness, is likely to injure self and/or others if not immediately detained." Furthermore, in her own handwriting, Dr. Goetcheus explained the bases for this conclusion: "67 year old homeless woman whose behavior has deteriorated in last 2 months. Noted by shelter staff to defecate in her bed & smear feces on bathroom walls, floor, her clothes and her body. Patient talking this a.m. of White House trying to contact her, the President trying to call her, and her husband is attempting to murder her. Daughter of patient states [patient] has had multiple psychiatric admissions w/diagnosis of paranoid schizophrenia. Staff has [observed] patient trying to light cigarette butts, at times almost catching her clothing on fire and concern about mattress catching fire. Patient is danger to herself and others."

On the basis of this application, appellant was taken into custody and presented for admission to St. Elizabeths Hospital. Thereafter, all the steps prescribed by statute were taken within the allotted time periods. Pursuant to § 522, a psychiatrist on duty examined appellant, tentatively diagnosed her as suffering from "atypical psychosis," and concluded that she was "likely to injure herself and/or others unless immediately hospitalized." Pursuant to § 523, the hospital within 48 hours filed a petition with the Superior Court seeking appellant's detention for an additional seven days of emergency observation and diagnosis, which was granted the same day pursuant to § 524.

Appellant then requested a probable cause hearing pursuant to § 525. Although scheduled for the following day, the hearing was postponed for one week because appellant fired her originally appointed attorney. At the outset of the rescheduled hearing, appellant moved to dismiss the case on the basis of the allegedly improper application. The trial court postponed ruling on the motion at that time. The hospital presented three witnesses: appellant's daughter, who recounted appellant's history of mental illness, Ms. Porter, and Robert Brown, M.D., a psychiatrist at the hospital. Appellant, who had interrupted the government witnesses some twenty times with verbal outbursts, testified on her own behalf, as did an investigator for the Public Defender Service.

Following the close of the government's case, the trial court addressed again the question of the assertedly deficient application and found that the subsequent proceedings had cured any such deficiencies. At the end of all proceedings, the court found that there was probable cause to believe that appellant was mentally ill [4] and that as a consequence, she was a danger to herself if allowed to remain at liberty. Accordingly, he ordered that she continue to be hospitalized for emergency observation and diagnosis pursuant to § 524(a)(1).

Even prior to the probable cause hearing, on June 14, 1990, the hospital had filed a petition for judicial hospitalization pursuant to § 541. As a result of this petition, appellant was entitled to a prompt hearing before the Commission on Mental Health and the other procedures, including a jury trial, provided in cases of hospitalization under court order, §§ 541–551.[5] However, appellant has chosen not to avail herself of these statutory opportunities for review of her condition,[6] pending disposition of this expedited appeal from the trial court's refusal to order her release. The appeal is based on the sole ground that the original

---

4. Dr. Brown had diagnosed appellant's condition as "paranoid schizophrenia."

5. Under § 528, the timely filing of the petition also permitted the continued detention of appellant beyond the seven day emergency period, unless the trial court failed to find probable cause under § 525.

6. Our prior holdings indicate that even if appellant were released pursuant to such subsequent proceedings, we would not treat as moot appellant's appeal raising the issue of the sufficiency of the original application. *See In re Rosell,* 547 A.2d 180, 181 n. 2 (D.C.1988) (citing *In re Morris,* 482 A.2d 369, 371–72 (D.C.1984)). Rosell was discharged from the hospital within several days after the probable cause hearing. Whether indefinite hospitalization following proceedings under §§ 541 to 551 would "cure" any defects in the original emergency proceedings not otherwise cured by the § 525 hearing is, to be sure, less clear.

application was assertedly defective.[7] We turn to that issue.

## II

We deal here with those sections of the D.C. Hospitalization of the Mentally Ill Act (also known as the Ervin Act) dealing with the involuntary emergency hospitalization of persons believed to be dangerously mentally ill. Under § 521, such hospitalization can be initiated only as follows:

> An accredited officer or agent of the Department of Human Services of the District of Columbia, or an officer authorized to make arrests in the District of Columbia, or a physician or qualified psychologist of the person in question, who has reason to believe that a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained may, without a warrant, take the person into custody, transport him to a public or private hospital, and make application for his admission thereto for purposes of emergency observation and diagnosis. The application shall reveal the circumstances under which the person was taken into custody and the reasons therefor.

Thus, only three categories of individuals—employees of the Department of Human Services, police officers, and physicians and qualified psychologists "of the person in question"—are authorized to make the necessary initial application.

A further limitation on such applications insofar as physicians and qualified psychologists are concerned is found in § 582 (contained in the subchapter on "Miscellaneous Provisions"). Its subsection (b)[8] is relevant to appellant's argument here:

> A petition, application, or certificate of a physician or qualified psychologist may

not be considered unless it is based on personal observation and examination of the alleged mentally ill person made by the physician or qualified psychologist not more than 72 hours prior to the making of the petition, application, or certificate. The certificate shall set forth in detail the facts and reasons on which the physician or qualified psychologist based his opinions and conclusions.

In *In re Rosell, supra,* 547 A.2d at 181, the application for Rosell's commitment had been made by a physician, but one who was found by the trial court not to be in fact the physician "of the person" of Rosell, as required by § 521. Nonetheless, we held that the trial court correctly ruled that continued detention of Rosell was justified because the government had met its burden of showing at the hearing that probable cause existed to believe that Rosell was mentally ill and was likely to injure herself if not detained. In so holding, we found controlling our prior decisions in *Williams v. Meredith,* 407 A.2d 569 (D.C.1979), and *In re Morris,* 482 A.2d 369 (D.C.1984).

In *Williams,* the physician also had not qualified as a physician "of the person." Rosell attempted to distinguish *Williams* on the ground that in *Williams,* the challenge to the application had not come until after the completion of the probable cause hearing under § 525, while Rosell had raised the objection at the outset, but we saw no significance in this procedural distinction. In the *Morris* case five years later, we were faced with an application which had been altered to state that the physician had examined Morris within the previous 72 hours, when in fact he had not seen him within the previous two weeks. Morris sought to avoid the holding in *Williams* by withdrawing his request for a

---

**7.** Before us, appellant does not challenge as such the sufficiency of the evidence at the probable cause hearing.

**8.** Subsection (a) also contains limitations: "A petition, application, or certificate authorized under section 21–521 and subsection (a) of section 21–541 [dealing with 'petitions' for the initiation of formal judicial hospitalization proceedings] may not be considered if made by a physi-

cian or qualified psychologist who is related by blood or marriage to the alleged mentally ill person, or who is financially interested in the hospital in which the alleged mentally ill person is to be detained, or, except in the case of physicians or qualified psychologists employed by the United States or the District of Columbia, who are professionally or officially connected with the hospital."

judicial hearing under § 525. We still ruled that the court's *ex parte* determination of probable cause for further detention under §§ 523 and 524 "remedied the imperfection of the initial application." *Rosell,* 547 A.2d at 182 (discussing *Morris*).

Plainly, then, under *Rosell,* the fact that, as appears to be the case [9], the physician signing the application under § 521 was not the "physician of the person" of appellant cannot be a ground for ordering appellant's release in light of the findings of the trial court at the hearing under § 525.[10]

### III

■■■ Appellant, however, argues that an additional ground of invalidity, absent in *Rosell,* is present here; namely, that the application is not "based on personal observation and examination of the allegedly mentally ill person made by the physician," as required by § 582(b), quoted above.

The substantive issue at bottom is how far the statutory command for "personal observation and examination" extends. The legislative history of this particular provision is thin. The bill to revise the procedures for the hospitalization of the mentally ill and guarantee those hospitalized civil rights was originally introduced in the 87th Congress, 2d session, as S. 3261, but little action was taken. It was reintroduced in the 88th Congress, 1st session, as S. 935. The Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary held public hearings over three days and received testimony from twenty expert witnesses. Judge Alexander Holtzoff of the United States District Court for the District of Columbia appeared in his individual capacity and as a representative of the court. Judge Holtzoff submitted to the subcommittee a draft proposal to replace the original bill. Section five of the judge's proposal, which provided for the qualifications necessary for a physician to be able to complete a certificate to have a

person detained at St. Elizabeths, was substantially similar to then existing law except for the third sentence which stated that "[n]o such certificate shall be considered unless it is based on personal observation and examination of the person alleged to be mentally ill made by the certifying physician not more than 72 hours prior to the making of the certificate." *To Protect the Constitutional Rights of the Mentally Ill: Hearing on S. 935 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary,* 88th Cong., 1st Sess. 17 (1963).

A revised bill written by the subcommittee offered in substitution of the original bill incorporated much of what Judge Holtzoff proposed. Section 7(h) of the revised bill, which referred back to § 6(a) allowing a person's family physician to apply to have the person involuntarily transported to a hospital, contained the provision that "[t]he petition, application, or certificate must be made on personal observation within 72 hours prior to its making." S. 935, S.REP. No. 925, 88th Cong., 2d Sess. 6 (1964). The committee stated that "Judge Alexander Holtzoff of the U.S. District Court for the District of Columbia, indicated the need for such an addition to exclude some loose certificates which occasionally have been presented." *Id.* at 19. No further mention of this provision was made as it passed through the Senate and the House of Representatives and went to the President for signature.

We are not faced here with a situation of a physician operating by proxy or *in absentia* or in a merely formal sense. Dr. Goetcheus had personal contact with the prospective admittee for "several minutes," the sole purpose of which was to allow Dr. Goetcheus to determine whether appellant's mental condition required emergency hospitalization. Appellant terminated the interview by getting up and walking away.

---

**9.** The government does not concede the point, arguing that the trial court had no occasion to develop the full facts. See note 11 *infra.*

**10.** The government reads *Rosell, supra,* 547 A.2d at 182, to hold that the trial court's ex parte

order under § 524 constitutes a cure, regardless of a § 525 probable cause hearing. That portion of the opinion, however, was dealing with the fact situation in *Morris,* where the appellant had waived his right to a § 525 hearing.

Dr. Goetcheus also undertook to talk personally with other members of the staff who could speak of appellant's condition, and she undertook to discuss the situation further with Dr. Keesling, who "checked out" the EPRD's visit with appellant the previous day and advised Dr. Goetcheus to make the application.[11] The application contained a detailed report of Dr. Goetcheus's investigation into appellant's condition to support the statement that she had reason to believe that appellant was mentally ill.

We think it would be unwarranted to read § 582 as requiring that the physician signing the application act solely on facts acquired by his or her own personal observation. We have recognized that psychiatrists and psychologists where appropriate may and do rely, in part, on reports of others. *See, e.g., Clifford v. United States,* 532 A.2d 628, 632 (D.C.1987).[12] However the statutory provision may apply to petitions for formal hospitalization under § 541, we recognize that we are dealing here with an application for *emergency* hospitalization, where time is a factor. Furthermore, in the case before us, it was the appellant herself who chose to terminate the examination and thereby frustrate whatever further personal observation and examination Dr. Goetcheus might be in a position to make. We conclude in the circumstances of this particular case that Dr. Goetcheus, having involved herself personally in the process of determining appellant's need for emergency hospitalization and faced with a refusal of appellant to cooperate, did all that the statute required.[13]

A further reason for applying a certain leeway in interpreting the section is demonstrated by its coverage only of physicians and psychologists. This is only one of the three classes of persons who may initiate emergency hospitalizations. No comparable requirement of personal observation of the allegedly mentally ill person is imposed on officers or agents of the Department of Human Services nor on law enforcement officers, as might be expected if personal observation of all relevant facts were considered a vital part of the application. Instead, the structure of the act seems to place primary medical reliance upon the mandatory certificate of the psychiatrist or qualified psychologist on duty at the hospital under § 522, who must, *inter alia,* state that "he has examined the person."

■ It is true that the box in the application form certifying to the fact of personal observation and examination was not checked, and in that respect the application was facially defective. On the facts of this case, this omission was in the class of "minimal procedural deficiencies" which did not infringe on a patient's rights, *In re DeLoatch,* 532 A.2d 1343, 1345 (D.C.1987), since the paperwork omission could have been readily corrected. Nonetheless, in this respect the case does differ from *Rosell, Morris,* and *Williams,* where the alleged errors could not be detected by hospital personnel from the application itself. Where liberty interests are at stake, as here, it is not unreasonable to expect that

11. To the extent that the record is less than totally complete as to Dr. Goetcheus's interview with appellant and the subsequent investigation through the staff and the discussion with Dr. Keesling, appellant has mainly herself to blame. She did not raise the issue of the validity of the application until the very moment of the hearing, although she had been hospitalized at that point for some two weeks, and Corporation Counsel cannot be much faulted for being unprepared to present direct evidence on the issue.

12. To be sure, the full extent to which such reliance is warranted in legal proceedings is an unsettled matter. *See In re Melton,* 565 A.2d 635 (D.C.1989), *opinion vacated and reh'g grant-*

*ed en banc,* 581 A.2d 788 (D.C.1990). The standards to be applied for expert testimony in a jury trial, however, may not necessarily be the same when dealing with as tentative a document as an application for emergency hospitalization.

13. As the above discussion indicates, appellant's admission to St. Elizabeths was based on considerably more than a brief meeting between appellant and Dr. Goetcheus. We also have difficulty in finding fault in this record, where no bad faith is shown, with Dr. Goetcheus's attempt to ascertain the condition of a potentially mentally disturbed and dangerous individual by not overtly identifying herself as a physician.

care will be taken in completing and reviewing such forms.[14]

Excusal in certain circumstances of defects in applications for involuntary admission raises significant concern. It could encourage sloppiness in compliance with the statutory provisions, designed in part to protect the rights of those who may exhibit signs of mental illness but not in fact be in need of hospitalization. Although other remedies, such as liability in tort, may perhaps lie in cases where the statutory requirements have not been met, fairness in the overall operation of the statutory scheme depends upon a scrupulous attempt by all concerned to adhere to both the spirit and the letter of the law.

Still, as we said in *Rosell,* 547 A.2d at 183, "[a]t bottom, we deal here with a situation where a judicial determination has been made after a full evidentiary hearing that probable cause existed to believe that appellant was 'mentally ill and, because of that illness ... likely to injury herself or others' unless immediately hospitalized for observation and diagnosis not to exceed the limited maximum period allowed by the Act. In such circumstances, with full recognition of the important liberty interests at stake, some caution would seem in order against an excessively stringent interpretation of the emergency hospitalization portion of the Act before us here."

*Affirmed.*

ROGERS, Chief Judge, dissenting:

As the result of a brief meeting of three to five minutes between appellant and a person who disguised her identity as a doctor, and who failed to indicate on the emergency application form that she had personally examined appellant, appellant was deprived of her liberty for 48 hours. All of this is contrary to the plain language of the District of Columbia Hospitalization of the Mentally Ill Act (Ervin Act), D.C.Code §§ 21–521, –582 (1989), which contains specific requirements that must be followed by particularly identified persons before anyone may be deprived of his or her liberty incident to an emergency hospitalization.

The majority "affirm[s] the action of the trial court" by concluding that the statutory requirement for observation and examination was met under the circumstances of this case. *See* majority opinion at 2, 12. The net result of the majority's conclusion, however, is to render the statutory requirement for observation and examination virtually meaningless.

To reach its result, the majority states that the court should apply "a certain leeway in interpreting" the requirement of D.C.Code § 21–582(b) that an application be "based on personal observation and examination." *See* majority opinion at 13. This is a new standard for interpreting the Ervin Act, contrary to long-standing prior decisions. *See In re Lomax,* 386 A.2d 1185, 1188 (D.C.1978) (en banc) (the Ervin Act is narrowly construed where its application results in the curtailment of individual liberty). As the United States Court of Appeals for the District of Columbia Circuit observed in *Covington v. Harris,* 136 U.S.App.D.C. 35, 41, 419 F.2d 617, 623 (1969), civil commitment

> entails an extraordinary deprivation of liberty justifiable only when the respondent is 'mentally ill to the extent that he is likely to injury himself or other persons if allowed to remain at liberty.' A statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly, construed in order to avoid deprivations of liberty without due process of law. [Footnote omitted.]

Similarly, the majority's conclusion that the requirements for observation and examination mean no more than very limited

---

**14.** Corporation Counsel in its brief correctly characterizes the form involved in this case as less than clear. It has subsequently been replaced by a new version. On the other hand, Dr. Goetcheus's affirmative indication on the form that she was a physician "employed by the United States or the District of Columbia" is less explainable. Corporation Counsel suggests that the difficulty may have arisen because Dr. Goetcheus was employed by Health Care for the Homeless, an organization funded in large part by the District of Columbia Department of Human Services.

personal contact, *see* majority opinion at 11 (referring to "several minutes"), is contrary to the statutory language and legislative history. The Ervin Act requires that the certificate of a physician "shall set forth *in detail* the facts and reasons on which the physician ... based his opinions and conclusions." D.C.Code § 21–582(b) (emphasis added). The requirement for personal observation *and* examination was inserted at the bequest of Judge Alexander Holtzoff of the United States District Court for the District of Columbia who was concerned about "some loose certificates which occasionally ha[d] been presented."[1] *Protecting the Constitutional Rights of the Mentally Ill,* S.REP. No. 925, 88th Cong., 2d Sess. 6 (1964). In its ordinary meaning, the word "examination" suggests a detailed, pointed quest for information which will aid in reaching a diagnosis. *See* RANDOM HOUSE COLLEGE DICTIONARY 459 (rev. ed. 1986) ("examine" means "to inspect or scrutinize carefully"). The statutory language requires no less. Standards of care in medical malpractice cases involving erroneous commitment require, moreover, that the physician or psychiatrist must evaluate the patient in a careful and meaningful way.[2] Given the "profound congressional concern" for protecting the rights of a prospective patient, *Lomax, supra,* 386 A.2d at 1188, and the statutory preference for voluntary commitment, D.C.Code §§ 21–511, –514; S.REP. No. 925, 88th Cong., 2d Sess. 15 (1964); H.R.REP. No. 1833, 88th Cong., 2d Sess. 5 (1964), it necessarily follows that the examination requirement must be strictly construed to require proof that the examining physician has examined the potential patient in a careful manner. *See Nova Univ. v. Educ. Inst. Licensure Comm'n,* 483 A.2d 1172, 1179–80 (D.C.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985) (court's interpretation should not render any provision of statute meaningless); *Lomax, supra,* 386 A.2d at 1188.

Other than evidence of the fact that Dr. Goetcheus (while hiding her identity as a doctor) met with appellant for three to five minutes, there is very little evidence regarding their conversation, if any.[3] Sandra Porter, a social worker at the homeless shelter, testified only that the meeting occurred. Dr. Goetcheus did not testify, and Ms. Porter did not testify about the nature of the contact between appellant and Dr. Goetcheus. Nor did Dr. Goetcheus indicate, as called for on the application form, that she had examined and observed appellant.[4] Under these circumstances, it is difficult, at best, to conclude that the government met its burden to show that the contact between appellant and Dr. Goetcheus constituted an examination within the meaning of the statute. *See Williams v. Meredith,* 407 A.2d 569, 574 (D.C.1979); *In re Barnard,* 147 U.S.App.D.C. 302, 306–07, 455 F.2d 1370, 1374–75 (1971) (government has burden of proof and must offer live testimony where patient challenges the adequacy of the papers (including the application) on which the judge relies upon to

---

1. Prior to the enactment of the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473 (1970), civil commitment proceedings were handled by the federal courts of the District of Columbia.

2. *See, e.g., Maben v. Rankin,* 55 Cal.2d 139, 358 P.2d 681, 10 Cal.Rptr. 353 (1961) (en banc); *Kleber v. Stevens,* 39 Misc.2d 712, 241 N.Y.S.2d 497 (N.Y.Sup.Ct.1963), *aff'd,* 20 A.D.2d 896, 249 N.Y.S.2d 668 (1964); *James v. Brown,* 637 S.W.2d 914 (Tex.1982); *see also* J. Smith, MEDICAL MALPRACTICE PSYCHIATRIC CARE, § 12.06, at 493 (1986) ("physicians and psychiatrists should avoid certifying for commitment a patient whom they have not actually observed or evaluated in some reasonable way"); A. Holder, *Erroneous Commitment,* 219 J.AM.MED.A. 1389 (1972)

("in most states an examining physician owes the patient the legal duty to examine him in a duly careful manner before certifying the necessity for commitment. Failure to do so may be negligence").

3. The unchecked box states: "that I am not related by blood or marriage to the alleged mentally ill person; that I am not financially interested in the hospital to which said person is to be detained; and that the statements made hereinafter are based on my personal observations and examination of said person not more than 72 hours prior to the making of this application."

4. Dr. Brown had diagnosed appellant's condition as "paranoid schizophrenia."

authorize commitment under D.C.Code § 21–524).

A further difficulty in the majority opinion arises from the fact that the failure of Dr. Goetcheus to conduct a proper examination of appellant was not the only violation of the Ervin Act's emergency hospitalization provisions. As the majority concedes, see majority at 9, Dr. Goetcheus was not a physician of the person under D.C.Code § 21–521. To cure this defect the majority relies upon *In re Rosell,* 547 A.2d 180 (D.C.1988). Consequently, in determining that these violations are of no legal consequence—one because it was cured, the other on the ground that there was no violation—the majority has rendered superfluous the requirements of D.C.Code §§ 21–521, –582(b).

Heretofore, the court has excused violations of clear statutory requirements, explaining that such irregularities, other than violations of a statutory time limit,[5] could be cured by a subsequent judicial determination of probable cause of the need for further detention. In none of our prior decisions was there a deviation from more than one element of the statutory requirements.[6] By contrast, appellant was deprived of both an examination and a physician of the person.[7] Furthermore, the failure of the doctor to certify that she had personally examined appellant caused the application to be invalid on its face. Thus, no element of the emergency hospitalization application requirements, other than timeliness, had been met. Notwithstanding that the burden of proof is on the government, the majority has blamed appellant for deficiencies in the government's

evidence, see majority opinion at 538 n. 11, effectively turning the statute on its head.

The courts in this jurisdiction have long acknowledged the importance that Congress attached to the statutory requirements for emergency involuntary hospitalization. In the instant case the Emergency Psychiatric Response Division of District of Columbia General Hospital examined appellant the day before she was seen by Dr. Goetcheus and concluded that appellant did not require emergency hospitalization. Yet the very next day appellant was detained based on an application completed by a doctor who did not have the patient loyalty required by the statute and whose examination did not meet the proper standard of care and who was not otherwise eligible to apply for appellant's emergency detention. The government has offered no explanation for its failure to comply with the statutory requirements for emergency hospitalization applications, and, contrary to the majority's suggestion, majority opinion at 539, in view of the court's interpretation of the statute and application of the cure doctrine, the government has little incentive to assure rigorous compliance with the statutory requirements.

The effect of the majority's opinion, therefore, is to extend a general rule that defects in the initial application for emergency hospitalization under D.C.Code § 21–521 can, except when statutory time limitations are violated, be cured by a subsequent judicial determination that there is probable cause to continue detention. *See* majority opinion at 539. Here, neither the "physician of the person" nor the "personal observation and examination" requirements of the Ervin Act, D.C.Code §§ 21–

---

5. *In re Reed,* 571 A.2d 801 (D.C.1990); *In re Feenster,* 561 A.2d 997 (D.C.1989); *In re De-Loatch,* 532 A.2d 1343, 1345 (D.C.1987).

6. In *In re Rosell, supra,* 547 A.2d at 180, the doctor who examined the person for an hour was not "a physician of the person." In *In re Morris,* 482 A.2d 369, 373 (D.C.1984), the patient's physician had not examined the patient within 72 hours of preparing the application. In *Meredith, supra,* 407 A.2d at 573–74, the examining physician was a physician member of the Commission on Mental Health and not a "physician of the person."

7. The court has previously acknowledged congressional concern and the reasons for the requirement of a physician of the person. *See Rosell, supra,* 547 A.2d at 184 (Rogers, J., concurring) (discussing significance that Congress placed on requiring a physician of the person, rather than just any doctor, to apply for emergency hospitalization, because the former would "possess a patient-oriented role identification"); *Williams v. Meredith, supra,* 407 A.2d at 572–73 (same).

521, –582(b), nor other requirements relating to persons authorized to sign the emergency application form, § 21–582(a), were met. Thus, this is not a case involving minimal procedural deficiencies; instead the due process interests of appellant were infringed. *See In re DeLoatch, supra* note 5, 532 A.2d at 1345 (comprehensive statutory scheme protecting constitutional rights).

Most respectfully, I suggest that it is time for the en banc court to reexamine its interpretation of the statutory prerequisites for emergency hospitalization and the application of the cure doctrine to those provisions of the Ervin Act. No principled basis exists on which to distinguish between the violation of statutory timetables and the denial of other statutory rights that are designed to prevent erroneous involuntary commitments as well as unwarranted and unlawful detention. Without en banc review the court will be bound in the future to continue to render superfluous the statutory requirements for emergency hospitalization and the Ervin Act's protections will have become a mockery.

Accordingly, I respectfully dissent.