In the MATTER OF Ann
HERMAN, Appellant.

No. 90–FM–815.

District of Columbia Court of Appeals.

Argued En Banc June 17, 1992.
Decided Jan. 29, 1993.

J. Patrick Anthony, appointed by the
court, for appellant.

Sheila Kaplan, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Ann O'Regan Keary, Deputy Corp. Counsel at the time the brief was filed, were on the brief, for the Dist. of Columbia.

Laurie B. Davis, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for amicus curiae.

Before ROGERS, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB, FARRELL, WAGNER, KING and SULLIVAN, Associate Judges.

STEADMAN, Associate Judge:

Appellant was involuntarily admitted to St. Elizabeths Hospital for emergency observation and diagnosis under D.C.Code § 21–521 (1989). The application was signed by a physician who, appellant asserts, did not meet all the prerequisites set forth in the statute.[1] At a hearing held pursuant to § 525, the trial court found that probable cause had been established to believe that "respondent is mentally ill, and, because of that illness, is likely to injure herself unless immediately hospitalized." Accordingly, the court authorized continued emergency observation and diagnosis pursuant to § 524(a)(1), which cannot exceed seven days unless formal hospitalization proceedings are commenced. §§ 523, 528. A panel of this court affirmed the trial court's conclusion that even if the original application for emergency hospitalization did not meet the prerequisites of §§ 521 and 582(b), such defects, if any, had been remedied pursuant to a line of cases culminating in *In re Rosell*, 547 A.2d 180 (D.C.1988). *In re Herman*, 594 A.2d 533 (D.C.1991). We subsequently granted appellant's petition for rehearing en banc and vacated the panel's opinion and judgment in order to give full court consideration to the effect of such so-called "application defects" on the trial court's authority to order continued emergency hospitalization of a mentally ill person. *In re Herman*, 604 A.2d 1391 (D.C.1992).

■ We conclude that under the statutory scheme established for emergency hospitalizations, when the trial court becomes involved in the process pursuant to §§ 524 or 525, its focus should be on the present mental condition of the person involved and whether or not probable cause exists to believe that person is likely to injure himself or herself or others if not immediately detained. At that point in the process, a defect in the application itself should be taken into account insofar as it may bear upon the reliability and integrity of the application and the information therein, but should not be treated as a *per se* cause for immediate termination of the proceedings and release of the person involved no matter how dangerous to self or others. Particularly in light of other, expressly-created statutory and common-law mechanisms designed to protect against unauthorized and unwarranted applications, we are unwilling to read into the statute an unexpressed congressional intent that any defect in the application should without more invalidate the entire process of emergency hospitalization.

I

A

Appellant is a sixty-eight-year-old woman with a history of mental illness, including psychiatric hospitalizations over the past thirty years. In February 1990 she arrived in the District of Columbia, where she took up residence in the shelter operated by the Community for Creative Nonviolence, located at 2nd and D Streets, N.W. As time went on, the shelter staff became increasingly concerned about appellant's behavior, and invoked the aid of Priscilla Porter, a social worker assigned to work with female residents at the shelter who had become familiar with appellant during her stay

---

1. Specifically, appellant asserted that the physician was not a "physician or qualified psychologist of the person in question" under § 521 and that the application was not based on "personal observation and examination of the alleged mentally ill person" by the physician under § 582(b). These and all future section references are to Title 21 of the D.C.Code.

there. Appellant refused to speak with Ms. Porter or any other clinician about her situation or to accept any medical help at the shelter. A crisis mental health team from the Emergency Psychiatric Response Division ("EPRD") did make an hour-long assessment of appellant on June 7, 1990, but did not refer her for emergency hospitalization at that time.

On June 8, 1990, Ms. Porter requested that Jannelle Goetcheus, M.D., the medical director of the Health Care for the Homeless clinic, examine appellant at the shelter. Ms. Porter suggested to Dr. Goetcheus that she remove her stethoscope and not identify herself as a doctor because of appellant's unwillingness to speak with health care professionals. According to Ms. Porter, who witnessed the interview, appellant did speak briefly with Dr. Goetcheus "for several minutes,[2] until she [appellant] realized, I think, that she [Dr. Goetcheus] was a doctor ... And then she [appellant] got up and walked away." Dr. Goetcheus then spoke with several staff members who had observed appellant's behavior. She also discussed the situation with Dr. Keesling, the psychiatrist who is the head of the EPRD, and he advised her to make the necessary application for involuntary hospitalization.

Dr. Goetcheus thereupon filled out the application required by § 21–521. She erroneously checked the box identifying herself as a "physician employed by the United States or the District of Columbia." She also failed to check the box that related to compliance with the requirements of § 582.[3]

The form, signed by Dr. Goetcheus, did state, in its printed text, that the applicant has "reason to believe" that the person to be hospitalized "is mentally ill and, because of such illness, is likely to injure self and/or others if not immediately detained." Furthermore, in her own handwriting, Dr.

Goetcheus explained the bases for this conclusion: "67 year old homeless woman whose behavior has deteriorated in last 2 months. Noted by shelter staff to defecate in her bed & smear feces on bathroom walls, floor, her clothes and her body. Patient talking this a.m. of White House trying to contact her, the President trying to call her, and her husband is attempting to murder her. Daughter of patient states [patient] has had multiple psychiatric admissions w/ diagnosis of paranoid schizophrenia. Staff has [observed] patient trying to light cigarette butts, at times almost catching her clothing on fire and concern about mattress catching fire. Patient is danger to herself and others."

On the basis of this application, appellant was taken into custody and presented for admission to St. Elizabeths Hospital for purposes of emergency observation and diagnosis. Thereafter, all the steps prescribed by statute for emergency hospitalization were taken within the allotted time periods. Pursuant to § 522, a psychiatrist on duty at the hospital examined appellant, tentatively diagnosed her as suffering from "atypical psychosis," and concluded that she was "likely to injure herself and/or others unless immediately hospitalized." Pursuant to § 523, the hospital within 48 hours filed a petition with the Superior Court seeking appellant's detention for an additional seven days of emergency observation and diagnosis, which was granted the same day pursuant to § 524.

Appellant then requested a probable cause hearing pursuant to § 525. Although scheduled for the following day, the hearing was postponed for one week because appellant fired her originally appointed attorney. At the outset of the rescheduled hearing, appellant moved to dismiss the case on the basis of the allegedly improper application. The trial court postponed ruling on the motion at that time,

---

**2.** Ms. Porter subsequently estimated the time as "three to five minutes," and characterized appellant as having "stormed out."

**3.** The unchecked box states: "that I am not related by blood or marriage to the alleged mentally ill person; that I am not financially

interested in the hospital to which said person is to be detained; and that the statements made hereinafter are based on my personal observations and examination of said person not more than 72 hours prior to the making of this application."

and proceeded to hear the hospital's three witnesses. The first of these witnesses was appellant's daughter, who recounted appellant's history of mental illness. Next, Ms. Porter testified that she had learned from shelter staff that appellant smoked cigarettes while in bed and that she had defecated in her bed and had smeared feces in the bathroom. Ms. Porter had personally observed similar behavior, and she testified that she had seen what appeared to be feces on appellant's arms and under her fingernails, and had noticed that appellant "constantly" flicked lit matches. Finally, Robert Brown, M.D., a psychiatrist at the hospital, testified that he had diagnosed appellant's condition as "paranoid schizophrenia" based on his own personal observations, those of other hospital staff who had observed appellant during the nearly 18 days she had spent at St. Elizabeths prior to the hearing, and on the testimony at the hearing.[4] Appellant testified on her own behalf, as did an investigator for the Public Defender Service.

Following the close of the government's case, the trial court addressed again the question of the assertedly deficient application and found that the subsequent proceedings had cured any such deficiencies. At the end of all proceedings, the court found, based on the testimony at the hearing, that there was probable cause to believe that appellant was mentally ill and that as a consequence, she was a danger to herself if allowed to remain at liberty.[5] Accordingly, he ordered that she continue to be hospitalized for emergency observation and diagnosis pursuant to § 524(a)(1).[6]

## B

Of primary relevance to this case are two of the sections of the District of Columbia Hospitalization of the Mentally Ill Act (also known as the Ervin Act), D.C.Code §§ 21–501 *et seq.* (1989), dealing with the involuntary emergency hospitalization of persons believed to be dangerously mentally ill. Under § 521, such hospitalization can be initiated only as follows:

> An accredited officer or agent of the Department of Human Services of the District of Columbia, or an officer authorized to make arrests in the District of Columbia, or a physician or qualified psychologist of the person in question, who has reason to believe that a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained may, without a warrant, take the person into custody, transport him to a public or private hospital, and make application for his admission thereto for purposes of emergency observation and diagnosis. The application shall reveal the circumstances under which the person was taken into custody and the reasons therefor.

Thus, only three categories of individuals— certain employees of the Department of Human Services, police officers, and physicians and qualified psychologists "of the person in question"—are authorized to make the necessary initial application to a hospital for the admission of the affected

---

4. The transcript thus appears to support the conclusion that Dr. Brown did not rely on Dr. Goetcheus's application in any significant way, if at all, in formulating his opinion of appellant's mental condition.

5. Nothing in the transcript indicates that the trial court relied on the information in the application in reaching this conclusion. The trial court did not refer to the application, but instead explicitly rested his decision on the report of the admitting psychiatrist and the testimony of Ms. Porter and Dr. Brown.

6. Even prior to the probable cause hearing, on June 14, 1990, the hospital had filed a petition for judicial hospitalization pursuant to § 541. The timely filing of the petition, coupled with the trial court's finding of probable cause at the § 525 hearing, permitted the continued detention of appellant beyond the seven day emergency period. D.C.Code § 21–528 (1989); *see In re Reed*, 571 A.2d 801 (D.C.1990). As a result of this petition, appellant was entitled to a prompt hearing before the Commission on Mental Health and the other procedures, including a jury trial, provided in cases of hospitalization under court order, §§ 541–51. However, appellant has chosen not to avail herself of these statutory opportunities for review of her condition, pending disposition of this appeal from the trial court's refusal to order her release. Appellant's appeal has been based on the sole ground that the original application was assertedly defective.

individual for purposes of emergency observation and diagnosis.

A further limitation on such applications insofar as physicians and qualified psychologists are concerned is found in § 582 (contained in the subchapter on "Miscellaneous Provisions"). Its subsection (b)[7] provides that:

> A petition, application, or certificate of a physician or qualified psychologist may not be considered unless it is based on personal observation and examination of the alleged mentally ill person made by the physician or qualified psychologist not more than 72 hours prior to the making of the petition, application, or certificate. The certificate shall set forth in detail the facts and reasons on which the physician or qualified psychologist based his opinions and conclusions.

As its starting point, the panel assumed, as had the trial court, that the physician who signed the application for emergency hospitalization of appellant was not the "physician of the person" as required by § 521.[8] Drawing on a line of cases beginning with *Williams v. Meredith*, 407 A.2d 569 (D.C.1979), which held that certain defects in applications made pursuant to § 521, including an application completed by one found not to be in fact the "physician of the person," were "remedied" by a trial court's subsequent finding of probable cause in a § 524 order or after a § 525 hearing,[9] the panel concluded that the trial court properly ordered the continued emergency hospitalization of appellant.[10] With respect to the alleged § 582(b) violation,

the panel concluded that by conversing with appellant, shelter staff, and the head of the EPRD before providing in the application a "detailed report" of the reasons for applying for emergency hospitalization, the physician, "having involved herself personally in the process of determining appellant's need for emergency hospitalization and faced with a refusal of appellant to cooperate, did all that the statute required." *Herman, supra*, 594 A.2d at 537–38. The panel noted that while excusing defective applications raised "significant concern," ordering the release of appellant would ignore the fact that the trial court had determined, after a full evidentiary hearing, that probable cause existed to believe that she was " 'mentally ill and, because of that illness ... likely to injure herself or others' unless immediately hospitalized for observation and diagnosis not to exceed the limited maximum period allowed by the Act." *Id.* at 539 (quoting *Rosell, supra*, 547 A.2d at 183).

As in the panel opinion, we will assume without deciding that Dr. Goetcheus was not the "physician of the person," and hence that the application for appellant's emergency hospitalization violated § 521 in that regard. With respect to the alleged § 582(b) violation, we will further assume, again entirely without deciding, that the extent of personal observation was insufficient to strictly meet the requirement of § 582(b). Therefore, we turn directly to the issue whether the alleged failure to meet these requirements barred the trial court from going on to consider whether in

**7.** Subsection (a) also contains limitations: "A petition, application, or certificate authorized under section 21–521 and subsection (a) of section 21–541 [dealing with "petitions" for the initiation of formal judicial hospitalization proceedings] may not be considered if made by a physician or qualified psychologist who is related by blood or marriage to the alleged mentally ill person, or who is financially interested in the hospital in which the alleged mentally ill person is to be detained, or, except in the case of physicians or qualified psychologists employed by the United States or the District of Columbia, who are professionally or officially connected with the hospital." While Dr. Goetcheus, by failing to check the proper box, did not affirmatively indicate on the form that she did not fall

within subsection (a), the statute does not expressly require such an assertion in writing and it is not contested that she in fact did not fall within the limitations of subsection (a). Only an alleged failure to comply with subsection (b) is at issue.

**8.** This point is not conceded by the government, which argues that the trial court had no occasion to develop the full facts.

**9.** *See also In re Rosell*, 547 A.2d 180 (D.C.1988); *In re Morris*, 482 A.2d 369 (D.C.1984).

**10.** Appellant has not challenged as such the sufficiency of the evidence at the probable cause hearing.

fact there was probable cause that appellant was likely to injure herself unless she was immediately hospitalized and from ordering appellant's continued emergency hospitalization based on that finding.

## II

### A

Our starting point is the text of the Ervin Act itself, particularly the subchapter dealing with emergency hospitalization procedures. No provision of this subchapter or any other provision of the Ervin Act explicitly provides that a trial court at a post-admission hearing should impose as the sanction for defects in the original application the immediate release of the person detained, even where there is sufficient evidence for the trial court to conclude that probable cause exists to believe that the person is mentally ill and is likely to injure himself or others if released.[11] *See In re Barnard,* 147 U.S.App.D.C. 302, 455 F.2d 1370 (1971) (applying probable cause standard to § 525 hearing and outlining respective burdens on parties). Therefore, a finding that Congress intended such a result must be somehow gleaned from the structure and operation of the Act. We think such an inquiry leads to a quite opposite conclusion.

To begin with, the involvement of the trial court does not come with the filing of the application. Rather, court involvement begins with a petition from the hospital administrator, and that, not the initial application, is the impetus of the proceeding. The hospital's petition must be filed within 48 hours from the time of admission if the administrator determines that the emergency observation and diagnosis requires detention beyond that period. § 523. Thus, by the time the matter reaches the trial court, a psychiatrist or qualified psychologist on duty at the hospital—that is, a professional specially trained in mental health—has examined the person and concluded that the person "has symptoms of a mental illness and, as a result thereof, is likely to injure himself [or herself] or others unless he [or she] is immediately hospitalized." § 522. In addition, the administrator has determined to admit the person for purposes of emergency observation and diagnosis, and notice of such admission has been given to the spouse, parent, or legal guardian of the person and to the Commission on Mental Health. *Id.*

As a result of these statutorily-required procedures, the trial court has before it at the time of the § 524 determination,[12] and is required to consider, not only the application but the certificate of the hospital's examining psychiatrist or psychologist and "any other relevant information." Such information can include the hospital's experience with the person over the days elapsed since admission. In short, the petition, not the initial application, is now the key operative document.

The trial court's task, then, is to focus upon the present mental state of the person and the probability of injury to the person or others, taking into account all relevant and available information. Nothing in § 524 suggests that the trial court should focus upon the processes whereby the person came to be admitted to the hospital to the exclusion of other considerations. To the contrary, § 524 appears to contemplate a substantive review, based on all of the information available to the trial court, of the mental condition of the hospi-

---

**11.** In this regard, we note that where Congress intended to prescribe the release of a person, it knew how to do so explicitly. *See, e.g.,* § 527 ("shall be immediately released"); § 544 ("shall immediately order his release").

**12.** Section 524 provides:
    (a) Within a period of 24 hours after the court receives a petition for hospitalization of a person for emergency observation and diagnosis, filed by the administrator of a hospital pursuant to section 21–523, the court shall:

    (1) order the hospitalization; or
    (2) order the person's immediate release.
    (b) The court, in making its determination under this section, shall consider the written reports of the agent, officer, physician or qualified psychologist who made the application under section 21–522, the certificate of the examining psychiatrist or examining qualified psychologist which accompanied it, and any other relevant information.

talized person at the time the petition is filed with the court. Immediate release based on a defective application is nowhere mentioned in the section. In the absence of textual support for the proposition that the trial court is not to consider all of the relevant information, as § 524 provides, whenever there is a formal defect in the application, we are disinclined to construe the section in this manner.

The same considerations warrant a like construction of § 525. Section 525 provides that when continued hospitalization is ordered under § 524, the trial court must hold a hearing within 24 hours of its request. Essentially, § 525 ensures that the person can have a full evidentiary hearing in which he or she can participate to challenge the correctness of the trial court's determination under § 524. In the absence of any evidence that Congress intended different considerations to apply to § 525 hearings than to § 524 determinations, we conclude that the trial court's focus at § 525 hearings also should be on the hospitalized person's present condition.

### B

Appellant quite properly raises the concern, which we share, that provision for emergency hospitalization can create a potential for erroneous commitments and unlawful detention. We do not doubt that while the emergency provisions were not

the exclusive subject of the Ervin Act,[13] Congress was well aware of this concern over their operation.[14] The Ervin Act's emergency admissions procedures represent one part of a broader effort "to revise the procedures for the hospitalization of the mentally ill in the District of Columbia and to guarantee to those hospitalized certain civil rights." SENATE COMM. ON THE JUDICIARY, PROTECTING THE CONSTITUTIONAL RIGHTS OF THE MENTALLY ILL, S.REP. No. 925, 88th Cong., 2d Sess. 9 (1964), U.S.Code Cong. & Admin.News, 1964, 1078 (hereinafter SENATE REPORT). One of the concerns to the drafters of the Act was to give appropriate and timely attention to those mentally ill persons who were likely to injure themselves or others unless immediately hospitalized. *Id.* at 3. Thus, the procedures for emergency admission provided fewer protections than did the procedures for longer-term judicial hospitalization, the rationale being that "it is necessary to give the individual immediate attention." *Id.* at 17.

As a consequence, the Ervin Act explicitly provides for certain precise safeguards for preventing abuses of the emergency hospitalization procedures. First, as already mentioned, the statute commands that a hospital may not admit for purposes of emergency diagnosis and observation a person for whom application is made under

13. Although Congress was no doubt concerned with the proper functioning of the emergency hospitalization procedures, its primary focus was on other aspects of the legislation. Thus, the principal sponsor of the legislation, Senator Sam Ervin, described the legislation in the following terms at the beginning of hearings to consider particular amendments to the Act: "Primarily, [the Ervin Act] was designed to encourage voluntary hospitalization; to define and protect the rights of a patient once he was in [a] hospital; and to ensure, as far as legally possible, that there is no stigma attached to the fact that a person has been hospitalized for a mental illness. The core of the law is a legal recognition of the right of civilly-admitted patients in public hospitals to medical and psychiatric care and treatment and to periodic review of their cases." *Constitutional Rights of the Mentally Ill: Hearings Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary,* 91st Cong., 1st Sess. 3 (1969) (Statement of Senator Sam Ervin).

14. For example, after participating in an off-the-record colloquy with Senator Ervin about the potential for abuse of emergency procedures, Professor Weihofen of George Washington University Hospital stated that "I am sure this subcommittee and any careful draftsman, would want to steer a careful course, so that it isn't too easy for a policeman to pick somebody up and have him locked up in a psychiatric ward or a hospital. You need pretty quick summary procedures for taking care of him, but you should then afford him a number of protections such as immediate examination when he gets into the hospital and a very limited period of emergency detention." *To Protect the Constitutional Rights of the Mentally Ill: Hearing on S. 935 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary,* 88th Cong., 1st Sess. 160 (1963) (hereinafter *Senate Hearings*).

§ 521 unless a psychiatrist or qualified psychologist on duty at that very hospital examines the person and concludes that the person will present a danger if not hospitalized. "The statute thus contemplates that the psychiatrist's certificate rather than the physician's application, will determine whether the patient will be confined for emergency observation and diagnosis." *Johnson v. United States*, 178 U.S.App. D.C. 391, 396, 547 F.2d 688, 693 (D.C.Cir. 1976) (per curiam). Indeed, in considering a claim of wrongdoing by the physician executing the application, the *Johnson* court concluded that "the intervening action of the hospital psychiatrist was an independent efficient cause, and thus legally the proximate cause, of appellant's confinement." *Id.* at 397–98, 547 F.2d at 694–95. In the case of a private hospital, even with such a determination, the hospital administrator may nonetheless refuse admission. While a public hospital must admit the person, the second determination of dangerousness is there made by a govern-ment employee presumably sheltered from conflicting considerations. In either case, internal discipline procedures may provide an additional check on examinations that do not comply with the requirements of § 522.

The statute also requires that particular scrutiny be given to applications under § 521 made by physicians or qualified psychologists. Under § 582, an application by a physician or qualified psychologist "may not be considered" by the hospital unless the person making the application meets a number of requirements, including the requirement that his application is based on the personal observation and examination of the mentally ill person not more than 72 hours prior to making the application.[15] By providing that hospitals may not consider applications that do not meet the prerequisites of § 582,[16] and by requiring hospital psychiatrists to conduct their own independent evaluations of persons for whom applications are made, the Act established

---

15. Although § 582 speaks of petitions, applications, and certificates, a close reading of the section makes clear that it applies only to *applications* under the emergency hospitalization provisions. Specifically, § 582(a) applies to "[a] petition, application, or certificate authorized under section 21–521 and subsection (a) of section 21–541...." Section 521 relates only to emergency applications to public or private hospitals, and § 541(a) relates to petitions and certificates needed to commence formal proceedings for judicial hospitalization. If Congress had intended § 582 to apply to the petitions and certificates filed in the context of emergency hospitalization, it would have referred to sections 522 and 523 in § 582.

Although subsection (b) of § 582 does not also contain the words "authorized under section 21–521 and subsection (a) of section 21–541," there is no reason to believe that Congress intended subsection (b) of § 582 to relate to different petitions, applications, and certificates than those referred to in subsection (a). In this regard, we note as well that Judge Alexander Holtzoff of the U.S. District Court for the District of Columbia, who recommended the personal observation requirement in order "to exclude some loose certificates which occasionally have been presented," did not even recommend that this requirement apply at all to emergency hospitalization proceedings. *Senate Hearings, supra* note 14, at 17; *see also* SENATE REPORT, *supra,* at 19. We conclude that a § 582(b) violation is not an absolute bar to judicial consideration of a hospital's petition under §§ 524 and 525. Whether the subsection bars the trial court from receiving into evidence or otherwise using such a defective application in making its decision is an issue we need not now address, since here it is evident that the application played no significant role in the trial court hearing and determination. See notes 4 and 5, *supra*.

16. An argument could be made that the process did not function properly in this case, since the box on the application certifying to compliance with § 582 was not checked. It seems fair to say, however, that in this case, the application reflected in the physician's own handwriting both a considerable inquiry and her medical conclusions. Of course, applications may be defective in ways that are not apparent to the admitting hospital personnel, as reflected by the requirement that a psychiatrist or qualified psychologist on duty at the admitting hospital conduct an independent evaluation of the person.

Corporation Counsel in its brief correctly characterizes the form involved in this case as less than clear. It has subsequently been replaced by a new version. On the other hand, Dr. Goetcheus's affirmative indication on the form that she was a physician "employed by the United States or the District of Columbia" is less explainable. Corporation Counsel suggests that the difficulty may have arisen because Dr. Goetcheus was employed by Health Care for the Homeless, an organization funded in large part by the District of Columbia Department of Human Services.

one procedure for ferreting out abusive or unwarranted applications.

▬▬ Nor is review by the admitting hospital the only safeguard against unwarranted or erroneous emergency hospitalizations: the Ervin Act's strict time limits governing the process of emergency hospitalization provide a second tier of protections against extended deprivations of liberty. As described above, § 522 of the Act provides that a hospital that admits a person under the emergency hospitalization procedures shall serve notice of the admission on the spouse, parent, or legal guardian of the person not later than 24 hours after the admission. Section 523 provides that a person admitted under § 522 may not be detained for more than 48 hours unless the administrator of the hospital has filed a written petition with the court for an order authorizing the continued hospitalization of the person for emergency observation and diagnosis for not more than seven days from the time the order is entered. Under §˙524, the court must rule on the petition within 24 hours of its receipt, and, if the court orders continuing hospitalization and the person requests a hearing on the matter, the court must hold the hearing within 24 hours of receipt of.the request. *See In re DeLoatch,* 532 A.2d 1343, 1345 (D.C.1987) (section 525 requires trial court to hold hearing within 24 hours of request, and failure to do so results in release of detainee). Finally, we have read § 528, which deals with the detention of persons hospitalized under the emergency procedures during the course of judicial proceedings, to require that a hospital file a judicial hospitalization petition within the seven-day period established·in § 523. *See In re Strickland,* 597 A.2d 869 (D.C.1991); *In re Reed,* 571 A.2d 801 (D.C.1990).

Although the correctness of our prior decisions interpreting certain of these time limitations rigidly to require the release of a person detained in violation of them is not squarely before us, this line of cases

necessarily is implicated by the question whether we have properly distinguished between violations of the statutory timetables and violations in the application process. The basis for such a distinction is derived from the statute itself. We think that the *DeLoatch* court correctly concluded that these timetables "evince[ ] the intention of Congress to permit emergency confinement for only short and precisely circumscribed durations.". 532 A.2d at 1345. Not only do §§ 522, 523, and 525 use the mandatory "shall," which we have said "creates 'a duty, not an option,' " *id.* at 1344 (quoting *DuPont Circle Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 530 A.2d 1163, 1170 (D.C.1987)),[17] the entire statutory scheme postulates independent judicial review as the cornerstone of the protections against erroneous deprivations of liberty. *See generally* SENATE REPORT, *supra; see also Morris, supra* note [9], 482 A.2d at 373. Since such review is at the heart of due process, we have treated failures to comply with those time limits for invoking such judicial review as implicating a core concern of the Act.

It is true that however well these subsequent safeguards may work, a defective application may result in a brief period of unauthorized involuntary detention. The statute itself shows that Congress was not unmindful of the problem. In addition to § 582, the statute imposes specific criminal penalties for certain abuses of the emergency hospitalization procedures. Section 591(1) of the Act provides for a fine of not more than $5,000 or imprisonment for a maximum of three years, or both, of any person who executes a petition, application or certificate or causes or assists another to cause the hospitalization of a third person without probable cause for believing that person to be mentally ill. The same penalties apply specifically to any physician, psychiatrist, or qualified psychologist who.knowingly makes a false certificate or

---

17. Although § 523 states that a person hospitalized pursuant to § 522 "may not be detained" for more than 48 hours unless a petition is filed with the court, the Senate Report makes clear that this provision is mandatory. Specifically, the Senate Report explains that the section mean that such a person "shall not be detained" for more than 48 hours. SENATE REPORT, *supra,* at 16.

application as to the mental condition of a person. § 591(3).

Furthermore, long existing case law opened the possibility of civil liability in tort. In *Jillson v. Caprio*, 86 U.S.App.D.C. 168, 181 F.2d 523 (1950) the plaintiff had brought a claim of false imprisonment against a physician specializing in psychiatry who, it was alleged, had caused a police officer to transport the plaintiff to a mental hospital by providing that officer with a written statement that he believed the person was mentally ill and in need of hospitalization. In reversing a directed verdict for the physician, the court noted that the then existing statute authorized an arrest other than in a public place [18] only upon affidavits of "two or more responsible residents" that they believed for specified reasons the person was unfit to be at large and, in addition, upon certificates of at least two physicians that they had examined the person and that "such person should not be allowed to remain at liberty and go unrestrained, and that such person is a fit subject for treatment on account of his or her mental condition." D.C.Code § 21–327 (1940). The court noted:

> In providing protection for persons whose relatives think or pretend to think they require restraint because of mental illness, Congress necessarily struck a balance between individual liberty and public safety. A policeman or a psychiatrist may think Congress should have drawn the line in a different place but may not make arrests on that theory. Some insane and some sane persons may well be thought dangerous, but even the most reasonable belief that they will do harm in the future does not justify doctor or layman in arresting them without statutory authorization and without a warrant. Appellee's calling neither defeats appellant's claim to damages nor reduces its amount.

*Jillson, supra,* 86 U.S.App.D.C. at 169–70, 181 F.2d at 524–25. The concurring judge

cautioned against too broad a reading of the holding. *Id.* at 170–71, 181 F.2d at 525–26. He noted that the common law recognized the power to restrain, summarily and without court process, an insane person who was dangerous at the moment. He would apply that rule in this jurisdiction while stressing that "the defendant must plead and prove that the emergency was real and immediate, and that the measures taken were reasonable under all the circumstances." He would further permit a defendant to prove in reduction of damages "that he was acting in good faith, that the patient was in fact in need of hospitalization, and that the hospitalization was beneficial." *Id.* at 170, 181 F.2d at 525.

That the concurring opinion's view was more likely to prevail is indicated by the subsequent holding in *Orvis v. Brickman*, 90 U.S.App.D.C. 266, 196 F.2d 762 (1952), involving a civil action against a police officer who transported a woman who had attempted suicide to a hospital where she was placed in a psychiatric ward. Although the case was decided on other grounds, the court noted that "we could not find that Congress, in enacting these provision of the statute [referring to the provision summarized above for detention of persons believed insane] intended to supersede the common law power of emergency arrest to such an extent as to impose civil liability upon a person who, acting reasonably, detains or restrains a person temporarily, for the purpose of mental observation, in order to prevent immediate serious harm or injury to the person restrained or to others." *Id.* at 272, 196 F.2d at 767.[19]

■ We have no occasion here to delve further into the intricacies of the civil law in this regard, other than to note the existence of such possibilities of relief. We note also, that as our case law indicates, a person who is improperly detained in the admission process may seek to have that

---

18. An officer could arrest without a warrant "any insane person or person of unsound mind" found in a street or other public place. D.C.Code § 21–326 (1940).

19. The court then cited to the concurring opinion in *Jillson v. Caprio, supra,* and the New York case on which that opinion relied, *Warner v. State,* 297 N.Y. 395, 79 N.E.2d 459 (1948).

admission expunged from the record. *See Morris, supra* note 9, 482 A.2d at 373–74.

### C

Finally, we reiterate the proposition that defects in the application are not, in truth, "cured" or "remedied" by the subsequent judicial determination under §§ 524 and 525. The defects remain defects and we do not trivialize them. We echo and adopt the exhortation of the panel opinion in this case:

> Excusal in certain circumstances of defects in applications for involuntary admission raises significant concern. It could encourage sloppiness in compliance with the statutory provisions, designed in part to protect the rights of those who may exhibit signs of mental illness but not in fact be in need of hospitalization. Although other remedies, such as liability in tort, may perhaps lie in cases where the statutory requirements have not been met, fairness in the overall operation of the statutory scheme depends upon a scrupulous attempt by all concerned to adhere to both the spirit and the letter of the law.

*Herman, supra,* 594 A.2d at 539. Furthermore, we reiterate the proposition that defects in the application are not irrelevant. The trial court quite properly should take such defects into account insofar as they bear upon the reliability and integrity of the application and the information therein. Reliance on a defective application must be taken with caution, if not discounted altogether. Here, as already indicated, that does not appear a concern. The trial court heard three separate witnesses and ample grounds existed for his conclusion apart from the application form itself.

Moreover, a realistic view of the specific defects should be taken. No direct conflict of interest appeared of the type set forth in § 582(a), and it would be groundless to speculate otherwise. Likewise, if Dr. Goetcheus's application was not based on a "personal observation and examination" of Ms. Herman sufficient to meet § 582(b), it certainly reflected a genuine personal involvement in the process and seemingly a

far cry from the concern about "loose certificates which occasionally have been presented," referred to by the federal judge who recommended the inclusion of that requirement in the Ervin Act. See note 15 *supra.*

Perhaps too easily, these mental health proceedings with their heavy involvement of the legal profession can slip into an adversarial posture, apparently pitting the abstract rights of the individual against those of the public. At times, this may indeed be so. But in truth, as this case may illustrate, the true interests of the individual can be more complex. The interests of a person who in fact is a danger to herself if not hospitalized would not necessarily seem well served by releasing her solely because of some procedural defect in the mechanism by which she has come to be hospitalized for emergency observation and diagnosis. *Cf. In re Melton,* 565 A.2d 635, 649–50 (D.C.1989) (Schwelb, J., dissenting) (characterizing as "pyrrhic" legal victories that established the right for a mentally ill person not to be required to take medication essential to his or her mental health), *on reh'g,* 597 A.2d 892 (D.C.1991) (en banc); *Addington v. Texas,* 441 U.S. 418, 430, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979) (rejecting standard of beyond a reasonable doubt as constitutionally required for civil commitment proceedings as potentially preventing commitment of patients desperately in need of institutional care; "[s]uch 'freedom' for a mentally ill person would be purchased at a high price"). We see no reason why the actions of those involved in the complicated mental health field, from application to treatment to final resolution, should not carry in general a presumption of good faith and devotion to the interests of the mentally ill as well as to the public who may be affected thereby.

In short, appellant would have us find an intent of Congress that any defect in the application process, no matter how small, should require the immediate judicial release of the person affected, no matter how dangerous to self or others. Absent a sig-

nificantly clearer declaration of such an intent, we must decline to do so.

*Affirmed.*

ROGERS, Chief Judge, with whom FERREN, Associate Judge joins, dissenting:

In addressing the contentions of Ms. Herman that her personal liberty was unlawfully interfered with, the court is called upon to construe a statute. The statute, known as the Ervin Act,[1] provides a comprehensive scheme designed to protect individual liberty again those who seek to confine a person in a mental hospital. In construing the statute, the court must look at the plain words of the statute and, where necessary for an understanding of the language, at the legislative history. *See Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 764 (D.C.1983) (en banc); *see also Arrington v. United States,* 585 A.2d 1342, 1344 (D.C.1991). It is not the role of a court to second-guess a legislative decision to afford statutory protections against interference with individual liberty. *See* majority opinion at 968. Moreover, in construing the statute the court is neither dictating how medicine is to be practiced, nor, in the instant case, evaluating a particular doctor's motives or good faith. If the statute, or the court's construction of it, presents problems for the medical profession or others, the remedy lies with the legislature.

Where individual liberty is at issue, the court cannot dismiss as "abstract rights of the individual," *see* majority opinion at 22, or as "hypertechnical" (a word used in a statement in support of the petition for rehearing en banc), the provisions of a statute enacted to protect individual liberty. *See Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972) (compulsory psychiatric treatment is "a massive curtailment of liberty"). Consequently, the Ervin Act has been strictly construed against the government by the courts in this jurisdiction. *See In re Lo-*

*max,* 386 A.2d 1185, 1187–88 (D.C.1978) (en banc) (a statute is to be narrowly construed where its application results in the severe curtailment of individual liberty) (citation omitted); *Covington v. Harris,* 136 U.S.App.D.C. 35, 41, 419 F.2d 617, 623 (1969) (the statute is "narrowly, even grudgingly, construed in order to avoid deprivations of liberty without due process of law"). The majority has offered no persuasive reason to abandon this approach to the construction of the Ervin Act. Were the majority to adhere to the rule of statutory construction that has been the law in this jurisdiction for more than two decades, the government could easily comply with the statute and thereby protect both society and individuals like Ms. Herman while assuring that such persons receive the mental treatment that they need. Instead, the majority jettisons a bedrock of constructional analysis without any apparent concern that it opens the door for a return to a time before the Ervin Act when homeless or "troubling" people, like Ms. Herman, were placed in mental hospitals against their will. *See, e.g., Lake v. Cameron,* 124 U.S.App.D.C. 264, 267–68, 364 F.2d 657, 660–61 (1966) (en banc) (psychiatric testimony suggesting that a 60–year old woman suffering from senility and poor memory needed watching, because she would wander off, as well as "care and kindness" and "attention," did not suggest that her illness "required the complete deprivation of liberty that results from commitment to Saint Elizabeths as a person of 'unsound mind' "); *id.* at 267 n. 9, 364 F.2d at 660 n. 9 (referring to testimony of Superintendent of Saint Elizabeths Hospital in 1963 that " 'for many older patients, the primary need was found to be for physical rather than psychiatric care' ") (citation omitted).

The effect of the majority opinion is no less than suspension of the statutory and constitutional rights of Ms. Herman, and any person similarly situated, for the period during which she was taken into custody pursuant to an application for emergency hospitalization that did not comply with

---

1. *See* the District of Columbia Hospitalization of the Mentally Ill Act, D.C.Code §§ 21–501 et seq.

(1989 Repl.).

the statute, and hence was a nullity. *See In re Morris*, 482 A.2d 369, 371, 374 (D.C. 1984) (stale examination resulted in § 521 application being null and void; involuntary hospitalization would have continuing social and legal consequences, for example, on right to vote, and might be used to support a future involuntary commitment); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982) (due process requires a procedure appropriate to the "competing interests involved") (citation omitted). The majority's effort to restrict judicial review ignores the fact that Ms. Herman's liberty was first jeopardized by Dr. Goetcheus' application for emergency involuntary hospitalization. The majority's reliance on the rationale in the legislative history that " 'it is necessary to give the individual immediate attention,' " will not bear the weight it is asked to bear. Majority opinion at 964 (quoting S.REP. No. 925, 88th Cong., 2d Sess. 9 (1964)). Nor, under the majority's constriction of judicial review, will its conclusion that "the entire statutory scheme postulates independent judicial review as the cornerstone of the protections against erroneous deprivations of liberty." Majority opinion at 966–968. Neither will the majority's suggestion that the defects here are insubstantial survive scrutiny. *See* majority opinion at 968.

The difficulty identified by the majority in affording any relief to Ms. Herman is that the statute fails to state explicitly what occurs when an unauthorized person signs an emergency application for hospitalization of a person otherwise at liberty without conducting the requisite examination. *See* majority opinion at 963, 964. The legislative history indicates, as the majority points out, that Congress was focusing on the problems of encouraging voluntary hospitalization and protecting the rights of patients who were already civilly-admitted to public hospitals. *See* majority opinion at 964 n. 13. Hence, the question is whether a court may ignore the illegal interference with a person's liberty that occurs in the course of deciding whether a person can be held for an emergency examination and diagnosis preliminary to an involuntary emergency commitment to a mental hospital.[2]

Notwithstanding the majority's avoidance of the issue, *see* majority opinion at Part I B, Dr. Goetcheus clearly failed to follow the Ervin Act's requirements in causing the involuntary emergency hospitalization of Ms. Herman. Section 521 provides that emergency hospitalization of Ms. Herman can only be initiated by the following procedure:

> An accredited officer or agent of the Department of Human Services of the District of Columbia, or an officer authorized to make arrests in the District of Columbia, or *a physician or qualified psychologist of the person in question,* who has reason to believe that a person is mentally ill and, because of the illness, is likely to injure himself [or herself] or others if he [or she] is not immediately detained may, without a warrant, take the person into custody, transport him [or her] to a public or private hospital, and make application for his [or her] admission thereto for purposes of emergency observation and diagnosis. The application shall reveal the circumstances under which the person was taken into custody and the reasons therefor.

D.C.Code § 21–521 (emphasis added). Section 582(b) places a further limitation on physicians and qualified psychologists by requiring that:

> A petition, application, or certificate of a physician or qualified psychologist may not be considered unless it is based on

---

**2.** In other words, is the *Ker–Frisbie* doctrine appropriately applied to civil commitment proceedings. *Ker v. Illinois,* 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421 (1886) (forcible abduction of person taken from one country to another and one state to another does not invalidate criminal conviction in latter state under Due Process Clause; existence of remedies in state court noted); *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952) (same; violation of Federal Kidnapping Act does not bar state prosecution of persons wrongfully brought into state by its officers). *See United States v. Alverez–Machain,* — U.S. —, —, 112 S.Ct. 2188, 2193, 119 L.Ed.2d 441 (1992) (respondent abducted from Mexico to United States can be tried in the federal court for criminal acts; "the rule in *Ker* applies").

personal observation and examination of the alleged mentally ill person made by the physician or qualified psychologist not more than 72 hours prior to the making of the petition, application, or certificate. The certificate shall set forth in detail the facts and reasons on which the physician or qualified psychologist based his [or her] opinions and conclusions.

D.C.Code § 21–582(b).

The provisions of § 521 are significant for the categories of persons whom Congress determined would be authorized to apply for involuntary emergency mental hospitalization of an individual. Except for the physician of the patient, the authorized persons are government employees, who are subject to government regulation and limitation of their conduct. A physician of the person, on the other hand, while not subject to such limitations, is by definition looking out for the best interests of his or her patient, exploring with the patient, without conflict of interest, all of the options for receiving appropriate treatment. *See Williams v. Meredith*, 407 A.2d 569, 573 (D.C.1979) ("physician . . . of the person" intended to refer to a physician who would "possess a patient-oriented role identification," and was a "voluntarily selected professional who owes professional responsibility and a professional's loyalty to the individual," by contrast with "public health officers and police officers [who] are guided by their duty to protect the public. . . . ," the exclusion of the latter was intended to reduce conflicts of interest that might jeopardize the physician's impartiality). Dr. Goetcheus did not fall within any of the categories of persons authorized by § 521 to initiate an emergency involuntary hospitalization.

It is undisputed that Dr. Goetcheus was neither "an accredited officer or agent of the Department of Human Services of the District of Columbia, [nor] an officer authorized to make arrests in the District of

Columbia." It is equally obvious that she was not "a physician or qualified psychologist of [Ms. Herman]." Before Dr. Goetcheus contacted Ms. Herman for the first and only time, a shelter worker informed her that Ms. Herman did not wish to speak with a doctor and recommended that Dr. Goetcheus remove her stethoscope before speaking with Ms. Herman so that she would not discover that Dr. Goetheus was a doctor. Dr. Goetcheus followed this recommendation to disguise her identity as a doctor. Dr. Goetcheus then proceeded to speak with Ms. Herman for a period of a two to five minutes during which time Ms. Herman had no idea Dr. Goetcheus was a doctor. As soon as Ms. Herman learned that Dr. Goetcheus was a doctor Ms. Herman abruptly terminated the conversation and refused to have any further contact with the doctor. Such negligible contact is wholly inadequate to serve as a basis for concluding that Dr. Goetcheus was Ms. Herman's physician under the Ervin Act. Dr. Goetcheus may have viewed herself as acting in Ms. Herman's best interests, but under the circumstances, no reasonable argument can be made that Dr. Goetcheus was the physician of Ms. Herman, and the majority's attempt to do so fails. The statute plainly requires more than "genuine personal involvement" for a few minutes. *See* majority opinion at 968. At the very least, Ms. Herman would have had to have been aware of Dr. Goetcheus' identity as a doctor before Dr. Goetcheus could be deemed Ms. Herman's physician for purposes of § 521.

But even if, because of possible difficulties presented by Ms. Herman's apparent hostility toward doctors,[3] Dr. Goetcheus were deemed to be Ms. Herman's physician under § 521, the doctor clearly failed to base her application for emergency hospitalization on "personal observation and examination of [Ms. Herman]" as required by § 582(b). In view of the consequences of

---

**3.** It bears noting that such alleged difficulties did not prevent persons from a team from the Emergency Psychiatric Response Division of D.C. General Hospital from speaking with Ms. Herman for approximately an hour on the night before Dr. Goetcheus filled out the application

for Ms. Herman's emergency admission. In addition, an investigator from the Public Defender Service spoke with Ms. Herman for "at least an hour and a half" at Saint Elizabeths Hospital, between the time of her emergency admission and the probable cause hearing.

such an intrusion for individual liberty, and the statutory scheme's preference for voluntary commitment, the three to five minute conversation with Ms. Herman could not, as a matter of law, constitute the statutory examination because the brevity of the contact stemmed from Ms. Herman's decision to terminate the conversation and not from the doctor's determination that a three to five minute conversation was a sufficient examination.[4] No suggestion appears in the record that alternatives to involuntary commitment were discussed with Ms. Herman or that she had rejected them; nor was there evidence that she was incapable of considering such alternatives.[5]

Thus, the question is whether the doctor's failure to satisfy these statutory requirements required Ms. Herman's release. The answer turns not upon whether the statute provides expressly for such release, as the majority concludes, *see* majority opinion at 963, 964, but rather on whether these statutory requirements are mandatory or directory. It is a fundamental principle of law that the failure to satisfy a mandatory statutory requirement deprives the government of its ability to proceed further because the government loses jurisdiction over the matter. *See, e.g., JBG Properties, Inc. v. District of Columbia Office of Human Rights*, 364 A.2d 1183, 1185 (D.C.1976) (stating that to hold that time limits for filing charges are mandatory rather than directory requirements would produce too harsh a result, depriving the Office of Human Rights of jurisdiction); *West Penn Power Co. v. Pennsylvania Public Utility Comm'n*, 104 Pa. Cmwlth. 21, 521 A.2d 75, 78 (1987) ("[f]ailure to follow a mandatory statute renders proceedings void, whereas failure to follow a directory statute does not") (citing *In re Nomination Papers of American Labor Party*, 352 Pa. 576, 44 A.2d 48 (Pa.1945)); *see also* 3 SUTHERLAND, STATUTORY CONSTRUCTION § 57.08 (5th ed. rev. 1992) ("proceedings are void if something is directed to be done which is the essence of the statute") (citation omitted). Accordingly, if the requirements of either § 521 or § 582(b), with which the doctor failed to comply, are mandatory, the District government was without jurisdiction to detain Ms. Herman.[6] Release is, by virtue of the mandatory nature of the § 521 provisions, an implied remedy of the statutory scheme. *See generally* 2B SUTHERLAND, STATUTORY CONSTRUCTION, § 55.02 (5th ed. rev. 1991).

To determine whether a statutory provision is mandatory or directory, the court has "employed a balancing test, weighing the prejudice to a particular litigant against the public interest in the official performing his or her duties." *Arrington v. Unit-*

---

**4.** The word "examination" suggests a detailed pointed quest for information which will aid in reaching a diagnosis. *In re Herman*, 594 A.2d 533, 540 (D.C.1991) (" 'examine' means 'to inspect or scrutinize carefully' ") (quoting RANDOM HOUSE COLLEGE DICTIONARY 459 (rev. ed. 1986) (Rogers, C.J., dissenting). *See* TABER'S CYCLOPEDIC MEDICAL DICTIONARY (15th Ed.1985) at 581. While the length of time that a proper examination of a person pursuant to § 582 will require will vary according to circumstances, and the particular circumstances may cause a physician or qualified psychologist to conclude that a brief examination is sufficient, this is not what happened here. The brevity of the contact was neither the doctor's decision nor based on the doctor's determination that so brief and casual a conversation would suffice as an examination. Rather, the contact ceased because of Ms. Herman's refusal to talk to someone who had misrepresented who she was and in fact was a doctor previously unknown to Ms. Herman. The record does not indicate whether Ms. Herman knew that Dr. Goetcheus worked for the homeless shelter that was trying to evict her.

Ms. Porter, a social worker at the shelter, stayed out of sight when Dr. Goetcheus went to speak with Ms. Herman so that Ms. Herman would not see the doctor and the social worker together.

**5.** That there are alternatives is made clear in our decision in *In re Artis*, 615 A.2d 1148, 1152–53 (D.C.1992), where a nursing home and community living with assistance and supervision were presented as alternatives to inpatient psychiatric treatment and hospitalization.

**6.** D.C.Code § 21–522 authorizes the hospital to: admit and detain for purposes of emergency observation and diagnosis a person to whom application is made under section 21–521, if the application is accompanied by a certificate of a psychiatrist or qualified psychologist on duty at the hospital stating that he [or she] has examined the person and is of the opinion that he [or she] has symptoms of a mental illness and, as a result thereof, is likely to injure himself [or herself] or others unless he [or she] is immediately hospitalized.

ed States, 585 A.2d 1342, 1344 n. 5 (D.C. 1991) (cases cited); see also M.B.E. v. Minority Business Oppor. Com'n, 485 A.2d 152, 155 (D.C.1984). The purpose for which the statute was enacted is a significant part of this analysis. See Arrington, supra, 585 A.2d at 1344–46; JBG Properties, Inc. v. District of Columbia, supra, 364 A.2d at 1185. Another element which should be considered, but is not determinative, is whether the statute includes "consequences of noncompliance." 3 SUTHERLAND, supra, § 57.08 at 24 (5th ed. rev. 1992). Upon application of the balancing test in the instant case the conclusion follows that both statutory requirements which the doctor failed to satisfy are mandatory.

In In re DeLoatch, 532 A.2d 1343 (D.C. 1987), the court rejected the hospital's suggestion that the statutory requirement, in § 525, that a hearing "shall" be granted within 24 hours of an involuntarily committed person's request for such hearing, should be read as directory rather than mandatory. Id. at 1344. In finding "no merit" to the hospital's suggestion, the De-Loatch court also rejected the hospital's view that the absence of a statutory provision specifying a consequence for failure to comply with the statutory provision was conclusive. Id. at 1344 & n. 2. In addition to the plain language of the statute, the court noted that the underlying purpose of the Ervin Act was "to provide for the often necessary emergency hospitalization of the mentally ill or those believed to be mentally ill while at the same time protecting their constitutional rights," and that interpretation of the hearing requirement as directory rather than mandatory "would do serious damage to the statutory scheme." Id. at 1345. Although the court did not spell out its analysis in terms of a balancing test, by holding that any detention of Ms. DeLoatch beyond the 24th hour was unlawful, the court necessarily concluded, in re-

jecting the hospital's suggestion that the time requirement be read as directory, that the deprivation of Ms. DeLoatch's liberty beyond 24 hours outweighed the public interest in detaining her beyond 24 hours. While the majority here does not overrule DeLoatch, its opinion fails to address persuasively why the time limits are mandatory but the requirements for a "physician of the person" and an application based on personal observation and examination are merely directory.[7]

A balancing test clearly demonstrates that the prejudice a person in Ms. Herman's position suffers from noncompliance with § 521 and § 582 outweighs the public interest in allowing the hospital to proceed despite the violations of law. The private interest is at its zenith when the government interferes with individual liberty. A person who is forced into a mental hospital against his or her will suffers every second from the deprivation of his or her liberty interest. There is nothing significant about the 24th hour of the deprivation of an individual's liberty such that one second longer becomes an unbearable burden and yet one second shorter is not. Furthermore, the protection of the liberty interests of the mentally ill is the primary concern of the Ervin Act. As the en banc court observed more than a decade ago in In re Lomax, supra, 386 A.2d at 1188, the "statutory scheme ... evolved out of a 'profound congressional concern for the liberties of the mentally ill.'" (citation omitted). In addition, the en banc court acknowledged in Lomax that a significant element of this protection provided by the core of the Ervin Act included the provision for "involuntary emergency hospitalization only where a certified emergency exists." Id. at 1188 n. 13. See In the Matter of Rosell, 547 A.2d 180, 185 n. 3 (D.C.1988) (Rogers, J., concurring) ("since emergency

---

7. This court has not always held that "shall" is a mandatory command. See Arrington, supra, 585 A.2d at 1344 & n. 5 and cases cited. The court in DeLoatch found "shall" to be a mandatory requirement in the context of the particular statutory scheme. 532 A.2d at 1345. The fact that the time limitations are core concerns because they invoke the provisions for judicial

review does not mean that § 521 and § 582 requirements, which do not invoke judicial review, are not also core concerns of the Ervin Act. Cf. majority opinion at 962 ("Since such review is at the heart of due process, we have treated failures to comply with those time limits for invoking such judicial review as implicating a core concern of the Act").

admission procedures lack some of the safeguards of judicial hospitalization, they should be used only in clear emergencies") (citing H.R.REP. No. 1833, 88th Cong., 2d Sess. 1 (1964), and S.REP. No. 925, 88th Cong., 2d Sess. 16 (1964)). Both § 521's limitation of the types of persons who are authorized to apply for involuntary emergency mental hospitalization to three distinct categories, and § 582(b)'s express requirements that a "physician or qualified psychologist of the person" conduct a good faith examination of the person to be hospitalized pursuant to an emergency involuntary hospitalization application are clearly directed at ensuring that such emergency hospitalizations occur only where a certified emergency exists.[8] The deprivation that an individual suffers by the failure of a physician to abide by these requirements is potentially very great. *See In re Lomax, supra,* 386 A.2d at 1187–88 (" 'statute sanction[s] such a drastic curtailment of the rights of citizens' ") (quoting *Covington v. Harris, supra,* 136 U.S.App.D.C. at 41, 419 F.2d at 623).

The public interest, on the other hand, in having proceedings continue despite a doctor's failure to abide by the physician of the person requirement and the good faith examination requirement is comparatively minor. This is so for one simple reason: the process for preparing an application for emergency hospitalization in the proper manner can begin the moment that an individual is released. *See, e.g., In re Feenster,* 561 A.2d 997, 1000 (D.C.1989) (citing D.C.Code § 512 (Repl.1989) (release of voluntary patient)); *cf. In re Lomax, supra,* 386 A.2d at 1189 (hospital has no right of appeal under Ervin Act after a verdict is rendered in favor of the petitioner, but noting that "[b]y the simple expediency of filing a physician's certificate (or a sworn written statement if a patient has refused examination) ... the whole process may begin anew within the confines and protections of the Act") (citation omitted). Despite society's interest in assuring that the dangerously mentally ill are confined, Con-

gress determined that there were prerequisites to taking an individual into custody for an emergency examination and diagnosis. The Ervin Act thereby makes clear that it is relevant how citizens come before the court in connection with involuntary emergency mental hospitalization applications, and that a *Ker–Frisbie* approach, *see* note 2, *supra,* would be inappropriate.

Although the majority acknowledges that due process protections apply, it concludes that those protections do not apply before the hospital's petition is filed with the court. *See* majority opinion at 965–966. Thus, it ignores when Ms. Herman's liberty was first jeopardized as well as the reality that once the commitment process is set in motion by an emergency involuntary application the committee (Ms. Herman) is placed in the position of having to demonstrate to the hospital why she should not be involuntarily committed. The majority concludes that only violation of the statutory timetables would require the release of a person taken into custody under the Act. *See* majority opinion at 966–967. But the failure to comply with the statutory procedures for taking an individual into custody against his or her will cannot be accurately characterized as harmless. Moreover, unlike the circumstances in *Williams v. Meredith, supra,* 407 A.2d 569, where only the petitioner's statutory right to a "physician ... of the person" was violated, Ms. Herman was denied the statutory protection of both a "physician ... of the person" provided by § 521 and the personal observation and examination required by § 582. The majority acknowledges that these are among the "precise safeguards for preventing abuses of the emergency hospitalization procedures." Majority opinion at 964, 965–966.

Furthermore, without explaining why the core provisions of § 521 and § 582 do not also "evince the intention of Congress to permit emergency confinement," *DeLoatch, supra,* 532 A.2d at 1345, only upon application of persons authorized by the

---

**8.** These were the statutory prerequisites to forcible abduction that Congress included in the statute to address concern about potential abuse

of the emergency procedures. *See* majority opinion at 964 n. 14.

statute, *cf. Lomax, supra,* 386 A.2d at 1188 n. 13, the majority intimates that Ms. Herman has other remedies for being taken into custody pursuant to an improper application. *See* majority opinion at 966–967. However, under the majority's analysis of those remedies, Ms. Herman, and any person similarly situated, is without any remedy since the record makes clear the doctor's apparent good faith, which would defeat any tort action, and suggests no basis for a criminal prosecution under § 591.[9] At the same time, there is nothing in the statute that prevents the release of Ms. Herman when the threshold statutory prerequisites for interference with a person's liberty have not been satisfied. *Cf. In re Barnard,* 147 U.S.App.D.C. 302, 305, 455 F.2d 1370, 1373 (1971) (Fourth Amendment protection against unreasonable seizures is not limited to cases involving arrests). The fact that Congress viewed violations of the Ervin Act as sufficiently serious to deserve criminal punishment does not also mean that Congress intended that other forms of relief would be unavailable where mandatory provisions directed at core protections were violated.[10] *See In re Morris, supra,* 482 A.2d at 374 (initial emergency involuntary detention "null and void" because initi-

ated pursuant to § 521 application based on a stale examination; hospital's records to be corrected). Nor does the fact that § 527 and § 544 prescribe release indicate any more than that express language was required because release was not otherwise necessary.[11]

Consequently, I cannot agree with the majority's view that the doctor's failure to comply with the statutory requirements under § 521 and § 582 did not affect the jurisdiction of the trial court to order Ms. Herman's hospitalization pursuant to § 524, within 24 hours after receiving the hospital's petition for emergency hospitalization. Although the § 524 judicial proceeding is initiated by the hospital's filing of a petition under § 522, and not by the filing of a valid § 521 application, in the absence of a § 521 application that is not a nullity, there is no basis on which the hospital may confine a person even to prepare the certificate of the on-duty hospital physician or psychologist required by § 522. Thus, there is no way for the court to determine whether there has been compliance with the time limitations in the statute. The 24–hour requirement in § 524 necessarily relies on the fact that an application under § 521 is a prerequisite to the

---

9. D.C.Code § 21–591 (1989 Repl.) creates a felony offense for acting without probable cause to believe a person is mentally ill, acting to deny a person a right under the Ervin Act, or knowingly making a false certificate or application.

10. Although there is a rule of statutory construction that the express provision in a statute of one procedure or remedy precludes other alternatives, *see McCray v. McGee,* 504 A.2d 1128, 1130 (D.C.1986), that rule must be applied sparingly. *See National Railroad Passenger Ass'n v. National Ass'n of Railroad Passengers,* 414 U.S. 453, 458, 460–61, 94 S.Ct. 690, 694–95, 38 L.Ed.2d 646 (1974) (regarding *expressio unius est exclusio alterius,* "even the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent," but finding that legislative history showed that Congress had considered and rejected alternative remedy, and therefore understood statute as providing exclusive remedy); *Carter v. Director, Office of Worker's Compensation Programs,* 243 U.S.App.D.C. 179, 182–83, 751 F.2d 1398, 1401–02 (1985) (*exclusio unius est exclusio alterius* "has force ... only when there is no apparent reason for the inclusion of one disposition and the omission of a parallel

disposition except the desire to achieve disparate results"); *National Petroleum Refiners Ass'n v. F.T.C.,* 157 U.S.App.D.C. 83, 87, 482 F.2d 672, 676 (1973) ("the maxim of statutory construction *expressio unius est exclusio ulterius* ... is increasingly unreliable ... for it stands on the faulty premise that all possible alternate or supplemental provisions were necessarily considered and rejected by the legislative draft[ers]") (citations omitted), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974); *Potomac Passengers Ass'n v. Chesapeake & Ohio Railway Co.,* 154 U.S.App.D.C. 214, 475 F.2d 325, 331 (1973) ("Whatever superficial appeal the maxim [*expressio unius est exclusio ulterius*] may have, courts have often noted that it must be applied with a certain degree of caution. It is only an aid to statutory interpretation, not a rigid rule of law") (citations omitted), *rev'd sub nom. on other grounds,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), *vacated* 161 U.S.App.D.C. 237, 494 F.2d 1156 (1974).

11. These sections require release even though a person who is an emergency committee may suffer from a mental illness if, as a result of that mental illness, the patient is not likely to be a danger to himself or to herself or to others.

hospital's petition. A precondition of the § 522 examination by the hospital, which results in a petition for a § 524 judicial review, is a valid application under § 521. Because the statutory requirements that the doctor violated are mandatory, the District government lacked jurisdiction to proceed based on that application. Thus, the hospital did not have authority to hold Ms. Herman in order to conduct an examination pursuant to § 522 that could serve as the basis for the hospital's petition.

The entire purpose of the emergency application process is to gain evidence from an examination of the potential patient to use as a basis for determining whether or not to seek a judicial order of involuntary commitment. It is contrary to the congressional concern about individual liberty as well as the statutory provisions designed to avoid abuse of the emergency hospitalization procedure to conclude that, although the hospital held Ms. Herman unlawfully in order to examine her, the hospital was entitled to rely on the examination conducted while Ms. Herman was unlawfully detained to seek her further involuntary confinement. Prohibition of the use of the results of the examination in subsequent stages of the proceeding or in future proceedings follows from the mandatory nature of the provisions of § 521 and § 582. Therefore, the absence of an express statutory provision providing for the release of Ms. Herman upon violation of § 521 or § 582 is not dispositive; release is, by virtue of the mandatory nature of the § 521 and § 582 provisions, an implied remedy of the statutory scheme. *See generally* 2B SUTHERLAND, *supra,* at § 55.02.

Where the majority opinion leaves the Ervin Act is, at best, unclear. Consider the fact that twenty-four hours before Dr. Goetheus signed the involuntary hospitalization application, the Emergency Psychiatric Response team from D.C. General Hospital concluded, after speaking with Ms. Herman for an hour, that she did not require involuntary hospitalization. Nothing in the record, including Dr. Goetcheus' application, suggests that an emergency had arisen since that time. Yet, as a result of a brief meeting of three to five minutes between Ms. Herman and a stranger who disguised her identity as a doctor, and who failed to indicate in the emergency application that she had conducted a personal examination, Ms. Herman, who terminated that meeting, was deprived of her liberty in a manner that violates the plain language of the Ervin Act on involuntary emergency hospitalization for mental treatment. The potential for abuse of the emergency hospitalization process is heightened by the fact that the doctor who signed the application acted at the behest of the homeless shelter where the doctor worked and where Ms. Herman was not going to be allowed to remain. These circumstances underscore the importance of the statutory limitation on the persons with authority to bring about such a dramatic interference with individual liberty.

The net result of the majority opinion, therefore, is to render meaningless the requirements for observation and examination by a physician of the person. It also no longer matters, under the majority's analysis, who signs a § 521 application. All such statutory violations jeopardizing individual liberty are "cured" by the hospital's subsequent petition to the court and the court's review of that petition.[12] Even the criminal law does not go so far. *Cf. Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (observing in regard to the Fourth Amendment that "[t]he makers of our Constitution * * * conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men [and women]"). Notwithstanding all the layers of protection in the Ervin Act that the majority describes, *see* majority opinion Part I B, there is no protection against the unlawful deprivation of Ms. Herman's liberty despite

---

**12.** The majority's effort to avoid the "cure" doctrine, in recognition of the reality that there is no "cure" of a violation of Ms. Herman's statutory rights, *see* majority opinion at 967, is unsuccessful: in its view, the violation still presents no obstacle to the continued detention of an individual.

the fact that the majority can identify neither a private nor a public remedy for the unauthorized interference with it. Judicial review is not the cornerstone of protection that the majority suggests, *see* majority opinion at 966–967, where there is not to be any judicial review of the unlawful detention pursuant to an invalid application under § 521 and § 582. While the majority correctly points out that the trial court considers not only the doctor's emergency application but the hospital's petition in determining whether to order continued detention, it errs to the extent that it interprets the statute to mean that Congress did not intend to limit emergency commitments to the certified emergencies for which it provided explicit procedures in § 521 and § 582 of the statute.[13] *See Floyd E. Davis Mortgage Corp. v. District of Columbia,* 455 A.2d 910, 911 (D.C.1983) ("a statute is to be constructed in the context of the entire legislative scheme") (citations omitted); *see also Carey v. Crane Service Co., Inc.,* 457 A.2d 1102, 1105 (D.C.1983) (and cases cited); *cf. In re Burton,* 541 A.2d 599, 602 (D.C.1988) (interpreting probate reform act after "reading the act as a whole ... together with its legislative history") (citations omitted). It further errs by concluding that except for time limitations, there is no remedy for significant procedural deficiencies directed at core protections in the Ervin Act.

The pity is that none of this is necessary. Requiring strict compliance with the emergency application provisions of the Ervin Act will not result in leaving at large dangerous, mentally ill persons. To avoid the confusion apparently experienced by the doctor in the instant case, the government simply needs to improve its § 521 application form. Moreover, if there is a legitimate basis for concluding that an emergency hospitalization of Ms. Herman is appro-

priate, a person who is authorized under the statute may fill out an application. If there is not a legitimate basis for such a drastic interference with Ms. Herman's liberty on an emergency basis, such authorized person could not do so, and therein lies the protection for all of us. Therein also lies the significance of the fact that twenty-four hours earlier the Emergency Psychiatric Response team found no need for emergency involuntary hospitalization of Ms. Herman. Although the record suggests that Ms. Herman needed care, and that she would not be allowed to remain at the homeless shelter, it does not follow that the only, much less necessary, alternative was emergency involuntary mental hospitalization initiated by a doctor who worked for the shelter and conducted, at most, a cursory examination.

In sum, the majority has needlessly overturned decades of jurisprudence in this jurisdiction requiring the strict construction of the Ervin Act by construing the statute to permit its clear violation and thereby suspend the statutory and constitutional rights of persons like Ms. Herman, while providing no remedy for the unauthorized interference with her liberty. In so doing the majority has failed to provide a reasoned rationale for continuing to treat statutory timetables as mandatory requirements of the Ervin Act while deeming the core signatory and examination requirements, which are prerequisites to a certified emergency commitment, as merely directory. The consequence of its flawed logic is to deny Ms. Herman, and persons similarly situated, the protection of both the statute and the constitution when the burden on the government of strict compliance with the statute is minor and the protection of society is readily achievable under the Ervin Act. The majority's suggestion that it adheres to the proposition of strict con-

---

**13.** The decision in *Williams v. Meredith, supra,* 407 A.2d at 574, is likewise flawed because it failed to apply the balancing test to determine whether the physician of the person (or family physician) provision was a mandatory or discretionary requirement of the Ervin Act. In *Williams,* the court stated that a member of the Commission of Mental Health could not be the physician of the person for purposes of signing

an emergency commitment order under § 521, but nonetheless concluded that the error was cured by a later probable cause hearing. *Id.* at 573–74. Our decision in *DeLoatch, supra,* 532 A.2d at 1343, was likewise flawed to the extent that it viewed the physician of the person requirement, an important statutory safeguard against abuses of the emergency commitment process, as a "minimal procedural deficiency."

struction of the Ervin Act, *see* majority opinion at 967–968, has a hollow ring for Ms. Herman and others who, in the future, may find themselves similarly situated. Ms. Herman was not suspected of any crime but, under the majority view, she is entitled to no greater protection against forcible abduction than a person who is sought to face criminal charges. *See* note 2, *supra.* Although the doctor had reason to think that Ms. Herman was mentally ill, that condition did not deprive Ms. Herman of the protections provided by the Ervin Act or the Constitution.

Accordingly, because the mandatory statutory prerequisites for interfering with her liberty by involuntary emergency hospitalization were not satisfied, the government lost jurisdiction to proceed and the trial judge erred by not ordering Ms. Herman's release. I respectfully dissent.